1

1                          - VOLUME B -

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                           - - -

5    UNITED STATES OF AMERICA,      :     CRIMINAL ACTION
                                    :
6              Plaintiff            :
                                    :
7              v.                   :
                                    :
8    DARRYL CHAMBERS,               :
                                    :
9              Defendant            :     NO.  97-105 (RRM)

10                          - - -

11                              Wilmington, Delaware
                                Tuesday, September 1, 1998
12                              9:03 o'clock, a.m.

13                          - - -

14   BEFORE:  HONORABLE RODERICK R. McKELVIE, U.S.D.C.J.

15                          - - -

16   APPEARANCES:

17              ROBERT J. PRETTYMAN, ESQ.,
                Assistant United States Attorney
18
                   Counsel for Plaintiff
19
                JOSEPH W. BENSON, P.A.
20              BY:  JOSEPH W. BENSON, ESQ.

21                   Counsel for Defendant

22

23                              Valerie J. Gunning
                                Official Court Reporter
24

25   ORIGINAL

1

2                    P R O C E E D I N G S

3

4           (Proceedings commenced at 9:03 a.m.)

5

6           THE COURT:  All right.  Proceed.

7           MR. PRETTYMAN:  Good morning, your Honor.

8           THE COURT:  Good morning.

9           MR. PRETTYMAN:  I'm not sure whether Mr.

10   Benson is finished from yesterday or not, or what the

11   exact status is.

12           THE COURT:  I think he is; right?

13           MR. BENSON:  With the --

14           THE COURT:  With whatever presentation you

15   want to make --

16           MR. BENSON:  I'm intending to call the

17   defendant at some point.

18           THE COURT:  Okay.  Do you want to go ahead

19   and put --

20           MR. BENSON:  I thought Mr. -- or Detective

21   Sullivan might testify.

22           THE COURT:  Do you want to put your witness

23   on, and then we'll get Mr. Benson to put his client on?

24           MR. BENSON:  That's fine.  Thank you.

25                        - - -

1

2                          PLAINTIFF'S TESTIMONY

3                              CONTINUED

4

5                     ... DETECTIVE LIAM SULLIVAN, having

6                been duly sworn as a witness, was

7                examined and testified as follows...

8                          DIRECT EXAMINATION

9    BY MR. PRETTYMAN:

10   Q.    Detective Sullivan, by whom are you employed?

11   A.    City of Wilmington, Department of Police.

12   Q.    How long have you been employed as a police officer

13   for the City of Wilmington?

14   A.    Almost 15 years now.

15   Q.    What is your current assignment?

16   A.    I'm assigned to the FBI Violent Crimes, Fugitive

17   Task Force.

18   Q.    And as part of your duties with that FBI Task Force,

19   do you also investigate cocaine and cocaine base, also

20   known as crack cases, trafficking cases?

21   A.    Yes.

22   Q.    Before you became assigned to the Task Force, did

23   you also serve on another federal Task Force?

24   A.    Yes.

25   Q.    Drug Enforcement Administration Task Force; is

1   that correct?

2   A.     Yes.

3   Q.     And how long did you serve on that Task Force?

4   A.     I believe it was two years.

5   Q.     As part of your duties on that Task Force, did you

6   regularly investigate cocaine and cocaine base, also

7   known as crack cases?

8   A.     Yes.

9   Q.     As part of your duties with the Wilmington Police

10  Department, did you ever serve in the Wilmington Police

11  Department Drug Unit?

12  A.     Four years.

13  Q.     And during the course of those four years, did you

14  have occasion, on a regular basis, to investigate cocaine

15  and cocaine base, also known as crack cases?

16  A.     That, in that capacity, basically I worked crack

17  cocaine cases, the majority of my tenure as a police

18  officer.

19  Q.     Do you see the Darryl Chambers who's the subject of

20  the statements and the testimony of Linette Crawford and

21  Faye Bullock and who you arrested on December 8th, 1997

22  in the courtroom today?

23  A.     I do see him at the defense table, in the

24  sweatshirt with the beard.

25          MR. PRETTYMAN:  Your Honor, may the record

Sullivan - direct                    5

1    reflect the witness has identified the defendant?

2                    THE COURT:  Yes.

3                    MR. PRETTYMAN:  Thank you.

4    BY MR. PRETTYMAN:

5    Q.    Approximately during the course of your whole career

6    as a police officer, how many cocaine and crack cocaine

7    cases have you participated in?

8    A.    I can give you a low end.

9    Q.    Whatever your best recollection is.

10   A.    The low end would probably be around 5,000.

11   Q.    Approximately how many cocaine and crack cocaine

12   search warrants have you participated in?

13   A.    Over a hundred.

14   Q.    Approximately how many debriefings of cooperating

15   defendants and defendants and witnesses have you

16   participated in involving cocaine and crack cocaine

17   investigation?

18   A.    Literally thousands.

19   Q.    Have you ever testified in State and/or Federal

20   Court as an expert on cocaine and crack cocaine

21   investigations?

22   A.    At one point or another I've testified in every

23   Court in the State of Delaware as an expert.

24   Q.    Approximately how many times have you testified

25   as an expert on cocaine and crack cocaine?

Sullivan - direct                    6

1    A.    I'd have to give you an estimate on that.

2    Probably around 50, maybe.

3    Q.    Do you regularly review the literature that comes

4    out from law enforcement on cocaine and crack cocaine

5    distribution and investigations?

6    A.    Yes.

7    Q.    Do you regularly and consistently talk to other law

8    enforcement experts in the field of cocaine and crack

9    cocaine investigations and distribution?

10   A.    Yes, sir.

11   Q.    Have you done that during the course of your time

12   as a police officer who investigates drug crimes,

13   including your times on the two Task Forces, the federal

14   Task Forces?

15   A.    That's correct.

16   Q.    As part of the -- part of your duties for the FBI

17   Task Force, the DEA Task Force and a Wilmington Police

18   officer, have you seen and seized cocaine base, also

19   known as crack?

20   A.    Yes.

21   Q.    Approximately how many times?

22   A.    Thousands.

23   Q.    The same question in connection with cocaine,

24   cocaine hydrochloride:

25                During the course of your duties as a law

1    enforcement officer, approximately how many times have

2    you seized or seen cocaine hydrochloride?

3    A.    Same answer:  Thousands.

4    Q.    What is the appearance, including the color and

5    the texture, of the seized crack cocaine that you've

6    seen or seized as part of your law enforcement duties?

7    A.    I'd say 99 percent of the time that I've seized

8    crack cocaine, it has the appearance of an off-white

9    or yellowy-type, rocky substance.

10   Q.    Clump-like, rocky?

11   A.    That's how they get the street term of rocks.

12   Q.    Have you ever seen crack cocaine that was wrapped

13   in plastic with duct tape in order to -- the duct tape

14   to keep the plastic together and sealed tightly?  Have

15   you ever seen that as part of your law enforcement

16   duties?

17   A.    Yes.

18   Q.    Approximately how many times have you seen that?

19   A.    Hundreds.

20   Q.    What is the appearance, including the color and

21   the texture, of the seized cocaine hydrochloride that

22   you've seen before as part of your law enforcement

23   duties?

24   A.    White, crystally-type powder substance.  Sometimes,

25   when it's in the transportation phase, or when it's

1   taken off what they call the block, which is what's

2   referred to as the kilo when you buy at times, it

3   comes off as in chunks.  Usually when it's in the

4   condensed packaging type, it will have the appearance

5   at times of being crack cocaine, but, in fact, it's not.

6   Q.      Okay.

7               In terms of that, the chunks that comes off

8   the block -- is brick another word for the block?

9   A.      There's block, brick, key, whole.

10  Q.      Does that chunk -- have you seen that chunky cocaine

11  hydrochloride and seen it crumbled in the hands or

12  crumbled with a cutting device, such as a razor blade or

13  some other item which can cut the cocaine hydrochloride

14  into the powdery substance that you see on the street?

15  A.      I've seen it broken down into powder on numerous

16  occasions.  Some with pharmaceutical-type utensils, some

17  with street-made utensils, some with razor blades.

18               There's a variety of ways of smashing it or

19  breaking it down.

20  Q.      Have you ever seen the cocaine hydrochloride that

21  was wrapped in plastic with duct tape, as I previously

22  described, so that it's sealed tightly?

23  A.      Yes.

24  Q.      Approximately how many times have you seen that?

25  A.      Hundreds.

Sullivan - direct                          9

1          MR. PRETTYMAN:  Your Honor, I'm going to

2   show this to Mr. Benson, then I'd like to approach the

3   witness, please.

4              (Mr. Benson handed an exhibit to Mr. Benson.)

5              (Pause while Mr. Benson reviewed the exhibit.)

6          MR. BENSON:  Okay.  No objection.

7          MR. PRETTYMAN:  Your Honor, I've been told by

8   Mr. Benson he has no objection to Government's Exhibit 10-F,

9   which is the lab report that the chemist testified to

10  yesterday, so I would move its admission at this time.

11         THE COURT:  All right.  It's admitted.

12  ***      (Government's Exhibit No. 10-F was received

13  into evidence.)

14  BY MR. PRETTYMAN:

15  Q.    Detective Sullivan, Government's Exhibit 10-F

16  (handing exhibit to the witness) is the lab report from

17  Dr. Dasgupta, who testified yesterday.  And Dr. Dasgupta

18  analyzed these substances, Government's Exhibit 9, and

19  determined it was cocaine base, also known as crack.

20  Government's Exhibit 10-A, B and D, which appear on the

21  lab reports as B, A and D, and determined that those

22  substances were cocaine hydrochloride.

23         I'm going to ask you to please open the

24  packages and tell me, based upon your training and

25  experience, what you believe each of the substances

1    were, are, and to tell the Court if that's consistent

2    with the way you've seen those items before?

3                  MR. BENSON:  Your Honor, I'm going to object

4    only as to it being really cumulative, I think.  We have

5    already heard testimony from a number of witnesses for

6    the Government, indicating exactly what that is, including

7    a chemist.

8                  I don't know that we need this officer.

9                  THE COURT:  There's no harm in it if it's

10   cumulative.

11                 MR. BENSON:  No.  It just prolongs the

12   hearing.  That's all.

13                 THE COURT:  I will allow it.

14                 MR. PRETTYMAN:  Thank you, your Honor.

15                 THE WITNESS:  I will just go in order here,

16   your Honor, start from this end out.

17   BY MR. PRETTYMAN:

18   Q.    Please tell which exhibit number it is when you are

19   opening it so we can keep track on the record.  There

20   should be a Government exhibit --

21   A.    First off, I have to state, these appear to have

22   already been opened.

23   Q.    They were opened in court yesterday.

24   A.    Okay.  Because this isn't the usual package that

25   you receive from the Medical Examiner's Office.

1    Q.    Right.

2    A.    It has been tampered with.

3    Q.    Right.

4          We're going to go by the exhibit sticker

5    number, the Government exhibit.  So this is Government

6    Exhibit 9 you have in your hand.

7          Would you hope that and take a look at the

8    substance inside and tell the Court what that is?

9    A.    Government Exhibit 9 is a large quantity of the

10   small -- do you want me to take them all out or just a

11   sample?

12   Q.    Take out whatever you need in order to make a

13   determination as to what the substance is in that

14   exhibit.

15   A.    I can tell you right now, this is crack cocaine.

16   Q.    And is that consistent with the crack cocaine that

17   you've seen as part of your law enforcement experience

18   in the amount of times that you've testified to?

19   A.    Yes.  There's also some bags in here.  They're all

20   with -- well, black horses.

21          And there are some bags with dolphins on it.

22   Q.    Do all the bags --

23   A.    That is powdered cocaine.

24   Q.    The dolphin ones are the powdered cocaine?

25   A.    Yes.

1  Q.    Look through the exhibit and see how many substances

2  in that exhibit is crack cocaine and how many is -- how

3  many are cocaine hydrochloride.

4  A.    242 small zip-lock bags are submitted.  240 have

5  black horses, which is crack cocaine.  Again, that's in

6  my experience and training.  And there are two plastic

7  bags with dolphins on it that have powder substance

8  which I believe to be powdered cocaine or cocaine

9  hydrochloride.

10         But there's 242, total.

11 Q.    Now, the items that are in front of you,

12 Government's Exhibit 9 and the various Government's

13 Exhibit 10, as I previously mentioned, were opened in

14 court yesterday.

15         Could you turn to the next Government

16 exhibit?  Well, Government's Exhibit 9, where was that

17 seized from?

18 A.    2602 Bowers Street, which is in Wilmington,

19 Delaware, New Castle County, for the State of Delaware.

20 Q.    And was that seized on December 8th, 1997, as part

21 of the search warrant for Faye Bullock's house in which

22 on that same night Darryl Chambers was there and

23 arrested?

24 A.    That is correct.

25 Q.    Pleasing to the next exhibit.

1   A.    This is Government Exhibit 10-D.

2              (Pause while the witness opened the exhibit.)

3   BY MR. PRETTYMAN:

4   Q.    Now, one of these I opened yesterday.  Be careful,

5   because it will get on your hand.

6              Please open that up.  Government Exhibit 10-D

7   is what?

8   A.    I can see it from here.  This is what I'm telling

9   you about.  It has the appearance of just coming off

10  the block or the brick, but, in fact, it's actually

11  cocaine, powdered cocaine.

12  Q.    Okay.

13  A.    I mean, by looking on it, it's hard.  It has the

14  appearance of being crack cocaine, but just by looking

15  at it, I can tell you that it's powder cocaine.

16  Q.    Okay.

17  A.    And it is leaking.

18  Q.    Where was that seized from?  On what date?

19  A.    This was also seized at 2602 Bowers Street, again

20  in the City of Wilmington, which is New Castle County,

21  State of Delaware, on December 8th, 1997.

22  Q.    Was it seized from Faye Bullock's house as part of

23  the search warrant on the night when Darryl Chambers was

24  arrested there?

25  A.    That is correct.

1           The next is exhibit -- Government Exhibit

2   10-A.  This was seized from 2602 Bowers Street on the

3   8th of December, 1997, again, in conjunction with the

4   investigation involving Faye Bullock and subsequent

5   arrest of Darryl Chambers.

6           (Pause while the witness opened the exhibit.)

7           THE WITNESS:  Same as -- this is more of the

8   powder.  It's not in the -- appearance of coming off a

9   block or a brick.  This is simply just powder, white

10  powder substance, which I believe to be cocaine.

11  BY MR. PRETTYMAN:

12  Q.   And that was seized on December 8th, 1997, from

13  Faye Bullock's house on the night that Darryl Chambers

14  was arrested there?

15  A.   That's correct.

16           The last one is Government Exhibit 10-B,

17  which was seized from 2602 Bowers Street on the 8th of

18  December '97.

19  BY MR. PRETTYMAN:

20  Q.   And, again, that's the same night that Darryl

21  Chambers was arrested there?

22  A.   At Faye Bullock's house.

23           (Pause while the witness opened the exhibit.)

24           THE WITNESS:  This is the same as the other

25  one, a white powdered substance, which I believe to be

1    powdered cocaine.

2    BY MR. PRETTYMAN:

3    Q.    Were you -- I'm sorry.  Take your time.

4    A.    That's okay.  It's the same.

5    Q.    Were you present on December 12th, 1997, when in the

6    presence of her attorney, Linette Crawford, wrote the size

7    of the packages of cocaine and crack cocaine that she

8    stored and transported for Darryl Chambers on like a legal

9    pad page?

10   A.    Yes.

11   Q.    And were you also present when she drew the inner

12   peanut -- she described these as peanuts; is that

13   correct?

14   A.    That's correct.

15   Q.    When she drew the smaller inner peanut as being

16   the smaller peanuts that she transported and the larger

17   peanut-shape diagram on the yellow piece of paper was

18   the larger peanuts that she transported; is that

19   correct?

20   A.    Linette described the different sizes of the

21   so-called peanuts that she transported and was asked to

22   draw them, and that piece of paper accurately depicts

23   what she remembers as being the sizes.

24   Q.    Okay.

25             And this is Government's Exhibit No. 12 that

1    you are referring to?  This is the original that Linette

2    Crawford drew the size of the peanuts of packages of

3    cocaine and crack cocaine that she transported and held

4    for Darryl Chambers; is that correct?

5    A.    That is, because we had her initial the document.

6    Her initials are on the bottom right-hand corner, LC,

7    12/12/97.

8    Q.    Detective Sullivan, I'm going to hand you what's

9    marked as 10-G and 10-H.  And as you discuss each, I

10   would ask that you please refer to them by either 10-G

11   or 10-H to keep track.  And I'm going to ask you

12   questions of those in comparison with exhibit,

13   Government's Exhibit 12.

14              Do you know what Government's Exhibits 10-H

15   and 10-G are?

16   A.    I know what 10-G is.

17   Q.    What is 10-G?

18   A.    This is what would be equivalent to what I've seen

19   in my experience and training as a kilo or a brick of

20   how cocaine is usually packaged for transportation.

21   Q.    When you say cocaine, is there a difference between

22   the way cocaine and crack cocaine would be packaged as

23   you're referring to that exhibit, 10 --

24   A.    This is 10-G.

25   Q.    With respect to 10-G?

1  A.    No.  It can be packaged the same way.  This

2  particular item was packaged by me and it is indicative

3  of what powdered cocaine would be, because it is a

4  powdered substance.

5  Q.    Okay.

6             In terms of the weight of that, if it were

7  crack cocaine packaged up, wrapped that way, would that

8  change your opinion on whether or not that is a kilogram-

9  size package that's Government Exhibit 10-G?

10  A.    It would basically be packaged the same.  A kilo

11  is purported to be a thousand grams, so a thousand grams

12  is a thousand grams.  It would be different in the fact

13  that it would be -- to the touch would be hard, rocky-

14  type material inside.  This is very soft to the touch,

15  compacted.

16  Q.    The size of the 2-kilogram size packages, would

17  the quantity of kilogram would be the same whether it

18  was cocaine or crack in that size package?

19  A.    It would vary slightly in that it would be a little

20  more bumpy only because the substance is a rocky-type

21  substance.  This is soft, smoother, where you might have

22  more bumps in it when you had the crack cocaine.

23  Q.    But the weights would be the same?

24  A.    A kilo is a kilo.

25  Q.    And the Government's Exhibit 10-G you have there

Sullivan - direct                    18

1    was weighed by yourself on a properly calibrated scale?

2    A.    This morning, at the FBI office.

3    Q.    And how much did that way?

4    A.    Prior to being packaged in this manner, the

5    substance alone was weighed at 1,000 grams.

6    Q.    And that is representative of a package wrapped up

7    of either a kilo quantity of cocaine or crack cocaine.

8    It wouldn't matter.  It's the same?

9    A.    A thousand grams is a thousand grams.

10   Q.    So that your answer is yes?

11   A.    Yes.

12   Q.    Now, the other item, 10-H, Government's Exhibit

13   10-H, I believe, that was packaged by another law

14   enforcement officer; is that correct?

15   A.    I have no idea what this is.

16   Q.    Okay.

17           How much does that weigh?  Do you know?

18   A.    I can't tell you.  By feeling it, it's over a

19   thousand grams.

20   Q.    And is that bigger or smaller than 10-G?

21   A.    Obviously quite smaller in size, but weighing both,

22   this is -- I'd have to say it's almost twice -- probably

23   about twice the weight of the -- 10-H is quite smaller

24   than G, but ways probably twice as much.

25   Q.    Now, I'm going to --

1          MR. PRETTYMAN:  First, your Honor, I move the

2     admission of Government's Exhibits 10-G and 10-H for

3     purposes of this hearing.

4          MR. BENSON:  Your Honor, I would like to

5     question the officer on voir dire.

6          THE COURT:  I will just reserve the decision

7     on the admission until cross, then.

8          MR. PRETTYMAN:  Thank you.

9     BY MR. PRETTYMAN:

10    Q.    I'm going to also hand you Defense Exhibit 1 (handing

11    exhibit to the witness).  And I'm going to ask you to

12    compare Government's Exhibit 12, which are the peanut-

13    sized packages drawn by Linette Crawford with Defense

14    Exhibit 1 and Government's Exhibit 10-G, and ask you

15    which is more similar in terms of size and packaging the

16    way Linette Crawford described to you and drew in your

17    presence the peanut-shaped packages on Government's

18    Exhibit 12?

19         MR. BENSON:  Your Honor, I'm going to object

20    to the question insofar as it relates to the drawing.  I

21    think that's something your Honor certainly can draw your

22    own conclusion from.

23         To the extent that he has questioned Miss

24    Crawford, certainly --

25         THE COURT:  Why don't you just rely on cross

Sullivan - direct                20

1    to put it in context?

2              MR. PRETTYMAN:  Thank you, your Honor.

3              THE WITNESS:  I can only go on what I was told

4    by Linette Crawford and Faye Bullock, and from what my

5    training and experience would dictate.  And, quite

6    honestly, I would have to look at all -- I don't know

7    what -- this is referred to, so I will leave that out.

8              Looking at these two packages and was

9    described to me by the two women and what my experience

10   would dictate to me, I can honestly tell you that the

11   10-G is I guess more -- is a closer representative of

12   the drawing than Defendant's Exhibit 1 would be.

13   Q.   And as part of your training and experience, have

14   you seen kilogram-shaped packages of cocaine and crack

15   cocaine that look the same or very similar to

16   Government's Exhibit 10-G, in terms of the way they are

17   wrapped?

18   A.   Again, to be honest, I've seen it both as

19   Government's Exhibit 10-G and I've also seen it as

20   Defendant's Exhibit 1.

21   Q.   And in terms of the peanut-shaped objects

22   described by Linette Crawford, Government's Exhibit 10-G

23   more closely resembles what she drew and described to

24   you than does Defense Exhibit 1; is that correct?

25   A.   That is correct.

1    Q.    As part of the determination process of changing

2    the peanut-shaped packages described by Linette Crawford

3    into weights for court purposes of cocaine and crack

4    cocaine, did you give an opinion as to what the weight

5    of the cocaine and crack cocaine that would be in the

6    peanut-shaped packages described and drawn by Linette

7    Crawford in Government's Exhibit 12 would be?

8                    MR. BENSON:  Your Honor, I object.  I don't

9    think it's relevant and I don't think that this officer

10   is qualified to give that.  And I don't think -- I think

11   it's prejudicial, because it calls for an opinion that

12   clearly is not in the defendant's interests, and there's

13   no basis for it.

14                   THE COURT:  But you can put it in context in

15   cross.  As a nonjury matter, I'm inclined to allow it

16   and offer the testimony.

17                   MR. PRETTYMAN:  Thank you, your Honor.

18   BY MR. PRETTYMAN:

19   Q.    Detective Sullivan, you were called to give an

20   opinion as to the weight of packages of the peanut-

21   shaped diagrams and descriptions given by Linette

22   Crawford to change that into weights for court purposes

23   so that we could decide how much weight of the drugs

24   were involved in this case; is that correct?

25   A.    I had made an opinion the day that we interviewed

1    both women.  And I stand by that opinion today.  And

2    that's based solely on my experience and training and

3    what I've seized in the past in that the picture drawn

4    on the 12th of December 1997 by Linette Crawford.  And

5    what is depicted here today as Government's Exhibit

6    10-G is a kilo, both in crack cocaine and in powdered

7    cocaine.

8              The only difference would be, again, is that

9    when you feel it, to the touch, it would be harder when

10   it is crack cocaine.

11   Q.    Have you ever, as part of your training and

12   experience, cooked cocaine hydrochloride into crack

13   cocaine or observed other law enforcement officers or

14   chemists do that?

15   A.    I have to break it down.  I've actually, in the

16   15 years that I've been a police officer, I've, at

17   controlled settings in the classroom, have manufactured

18   crack cocaine on several occasions and have watched it

19   by other police officers in controlled settings in the

20   classroom make crack cocaine.  And I've also been told

21   on numerous occasions by confidential sources and

22   informants on how to make crack cocaine.

23   Q.    If you cook crack cocaine -- if you cooked cocaine

24   using sodium bicarbonate -- I'm sorry.  Let me please

25   start that question again.

1          If you cook cocaine using sodium bicarbonate,

2    water and heat it up to turn it into crack and didn't

3    sell that crack for a day or two, would that crack

4    cocaine turn back into cocaine hydrochloride or powder

5    cocaine without any new cooking or manufacturing process

6    occurring?

7    A.    No.

8    Q.    And once it is cooked into -- once cocaine is

9    cooked into crack cocaine, it stays crack cocaine unless

10   some other cooking process is done on it or some other

11   processing is done like that, manufacturing of it; is

12   that correct?

13   A.    That is correct.

14   Q.    Did the crack cocaine that you made as part of

15   your police training exercises and that you saw other

16   chemists or law enforcement officers make as part of

17   those training exercises, was that consistent in color

18   and shape and texture as the crack cocaine you seized

19   as part of your duties?

20   A.    Yes.

21   Q.    And was that crack cocaine that you made and that

22   your classmates and chemists made as part of those

23   training exercises, was that made by processing cocaine

24   hydrochloride and sodium bicarbonate to make it into

25   crack?

1  A.    Yes.

2  Q.    Were you present, and did you participate in the

3  search of 2602 Bowers Street, Wilmington, State and

4  District of Delaware, on 12 -- on December 8th, 1997?

5  A.    I authored -- I was the affiant of the search

6  warrant.  Yes, I was present at the time of the search.

7  Q.    Were you also present when various items were

8  seized by Detective Januzzio of the Wilmington Police

9  Department?

10  A.    Yes.

11  Q.    Where was Darryl Chambers when that search warrant

12  was executed?

13  A.    Found in the second floor bedroom, fully clothed,

14  lying on a bed, huffing and puffing, panting.

15  Q.    The Government's Exhibits 9 and 10-A, B and D,

16  were those drugs seized during the execution of that

17  search warrant at 2602 Bowers Street on December 8th,

18  1997?

19  A.    They were.

20  Q.    Where was the crack cocaine exhibit seized during

21  the execution of that search warrant?

22  A.    The crack cocaine?  In the overhang over top of

23  the -- well, as you go out the rear door, there is an

24  overhang for weather purposes that has a small roof.  It

25  was tucked up into the siding of the overhang.

1  Q.    The cocaine hydrochloride that are in those

2  exhibits, where was that seized from on December 8th,

3  1997 at 2602 Bowers Street?

4  A.    The majority of it was found in the kitchen of

5  Faye Bullock's house, in a cabinet.

6  Q.    And you know this from either being personally

7  present or being told by Detective Januzzio; is that

8  correct?

9  A.    Both.  I was present, and then I was contacted by

10  Detective Januzzio and shown -- once it was located, shown

11  where it was.  I advised Detective Januzzio to go ahead

12  and remove it from the cabinet.

13  Q.    Both those quantities of cocaine and crack cocaine,

14  are they indicative of somebody using the drug or for

15  distribution?

16  A.    Distribution.

17  Q.    Is that based upon the quantity and the other items

18  that were seized there on December 8th, 1997?  Is that

19  what your opinion is based on?

20  A.    Yes.

21         MR. PRETTYMAN:  Your Honor, I want to show

22  these to Mr. Benson.

23         (Pause.)

24  BY MR. PRETTYMAN:

25  Q.    Detective Sullivan, I'm going to hand you a box that

1    contains evidence.  And I ask you to please review that

2    and see if that's the items that were taken during the

3    execution of the search warrant on December 8th, 1997,

4    at 2602 Bowers Street (handing box to the witness).

5                 (Pause while the witness reviewed the

6    exhibits.)

7                 THE WITNESS:  Yes.

8    BY MR. PRETTYMAN:

9    Q.    What is labeled Government's Exhibit 13?

10   A.    It's the Wilmington Police evidence tag, marked 8

11   December '97.  The case number is the same as reported

12   on the drug evidence, 97-21868.  The place of occurrence

13   is 2602 Bowers Street.  Person arrested is Darryl

14   Chambers.

15                 Do you want me to list the evidence?

16   Q.    What evidence was seized specifically that's just

17   tagged as 13?  This black book bag knapsack?  Is that

18   the black book bag knapsack that was seized from 2602

19   Bowers Street on December 8th, 1997, during the

20   execution of the search warrant?

21   A.    It was, in the kitchen cabinet.

22   Q.    Is there anything inside that at the moment?

23   A.    Yes.

24   Q.    What's inside there?

25   A.    A scale, some ammunition, some razor blades, some

1    Top rolling papers, some bags, two pagers.  This scale

2    is just a digital, small digital scale.  And some

3    ammunition for a 9-millimeter.

4    Q.    Now, the two pagers and other clothing that belonged

5    to Mr. Chambers were seized from another part of the 2602

6    Bowers Street; is that correct?

7    A.    Everything was seized from the kitchen cabinet

8    except, I believe, for the pagers and the other items

9    that are in the other bag.

10   Q.    Okay.

11         So Government's Exhibit 13, as you've

12   described it, with the exception of the pagers, were all

13   items that were seized from 2602 Bowers Street on

14   December 8th, 1997; is that right?

15   A.    Correct.

16         MR. PRETTYMAN:  Your Honor, I would move

17   the admission of Government's Exhibit 13.

18         MR. BENSON:  No objection.

19         THE COURT:  All right.  It's admitted.

20         MR. PRETTYMAN:  Thank you.

21   ***    (Government's Exhibit No. 13 was received

22   into evidence.)

23         THE WITNESS:  Do you want to separate the

24   pagers?

25   BY MR. PRETTYMAN:

1  Q.    The Government's Exhibit 14 -- Government's Exhibits

2  14 are in front of you now.  14-A and B.

3              And could you refer to each by 14-A and B and

4  tell the Court what they were, if they were seized during

5  the search warrant that we've been discussing about and

6  whether they were loaded or unloaded when seized?

7  A.    14-A is a blue steel Taurus 9-millimeter handgun

8  with a magazine and numerous 9-millimeter rounds.  At

9  the time of the search warrant and the seizure of this

10 weapon, the weapon was fully loaded, the magazine was

11 charged, and was found in the black bag, which was in

12 the cabinet in the kitchen at 2602 Bowers Street.

13 Q.    Was it operational and ready to be used?

14 A.    Functional and ready to go.

15 Q.    What is 14-B?

16 A.    Okay.  14-B is a Jennings -- is it Braco (phonetic),

17 Braco Jennings, .380 semiautomatic handgun with a

18 magazine and numerous .380 rounds.  Again, it was in the

19 same manner.  The weapon was loaded, the magazine was

20 fully charged, and in the black bag at the time of the

21 seizure in the kitchen cabinet.  And this weapon was

22 also ready to go.

23 Q.    Ready to go, meaning that both of those weapons

24 could be fired?  Dischargeable?

25 A.    Whenever whoever wanted to pull the trigger.

1    Q.    The next item I'm not sure has an exhibit sticker

2    on it.  I will call that 14-C.  And I'm going to ask you

3    what that is and where that was seized from?

4    A.    This is a Pelouze digital scale and it has a 10-

5    pound capacity.  It's a large digital scale.

6    Q.    Have you seen scales like that as part of your

7    training and experience in investigating drug cases?

8    A.    I have.

9    Q.    What are they used for?

10   A.    For the weighing of large quantities of illegal

11   substances.

12   Q.    And also are they used to break the packages down

13   into smaller quantities for sale?

14   A.    Yes.

15   Q.    Where was that found?

16   A.    Also in the kitchen cabinet.

17   Q.    Was that in the bag or not in the bag?

18   A.    This was next to the bag, I believe, but right in

19   the same cabinet.

20   Q.    Okay.

21           MR. PRETTYMAN:  Your Honor, I would move the

22   admission of Government's Exhibit 14-A, B and C.

23           MR. BENSON:  No objection, your Honor.

24           THE COURT:  They're admitted.

25   ***       (Government's Exhibits No. 14-A, B and C

1    were received into evidence.)

2    BY MR. PRETTYMAN:

3    Q.    Detective Sullivan, did you have an opportunity to

4    talk to a Bureau of Alcohol, Tobacco and Firearms

5    fingerprint examiner who examined the fingerprints of

6    Darryl Chambers that you took, as well as a fingerprint

7    lifted from that scale?

8    A.    Yes.   I believe his name was Rick Canty.

9    Q.    And did you also have an opportunity to not only

10   talk with him, but to be Faxed his report, as well as

11   expert qualifications?

12   A.    I had personally obtained the fingerprints or the

13   latent prints from Darryl Chambers and submitted them

14   to Rick Canty for comparison with a latent that he had

15   obtained or lifted off of the scale.

16         Through his comparing the one taken from the

17   defendant and the one lifted from the scale, he had

18   obtained a hit or a match.   And he had advised me of

19   this on two occasions.

20   Q.    He advised you that the defendant's fingerprint

21   was found on that scale?

22   A.    Yes.

23   Q.    Government's Exhibit 14-C?

24   A.    Correct.

25   Q.    What else do you have there?

1  A.    Two pagers.   They're not marked.

2  Q.    Okay.

3          Government's -- they're going to be marked as

4  Government's Exhibit 15.

5          Where were those pagers seized from and to

6  whom do they belong?

7  A.    They were seized from the defendant at the time of

8  his arrest inside of 2602 Bowers Street.   He had

9  admitted to me that they were his pagers at the time of

10  his arrest.

11  Q.    Have you seen pagers like that used in your

12  training and experience by people who distribute drugs

13  in order to have contact back and forth with the persons

14  with whom they're dealing?

15  A.    Yes.   Everybody has pagers these days, but all too

16  common are they used by drug dealers for the purpose of

17  making contact with clients.

18          MR. PRETTYMAN:   Your Honor, I would move the

19  admission of Government's Exhibit 15.

20          MR. BENSON:   No objection.

21          THE COURT:   All right.   It's admitted.

22  ***       (Government's Exhibit No. 15 was received

23  into evidence.)

24  BY MR. PRETTYMAN:

25  Q.    Government's Exhibit 16 is the next item.   Could

1  you tell the Court what that is and whether that was

2  also seized, as well as the other exhibits that you've

3  just mentioned, seized from 2602 Bowers Street during

4  the search warrant on December 8th, 1997, when the

5  defendant was arrested?

6  A.    This particular bag of evidence was not seized at

7  the time of the initial search warrant on the 8th of

8  December.

9  Q.    When did you receive that Government's Exhibit 16

10 and from whom did you receive it?

11 A.    I received it from Faye Bullock, who was the

12 resident and occupant of 2602 Bowers Street.

13 Q.    Did she tell you what those items were and what

14 those items are and what they were used for and to whom

15 they belong?

16 A.    Yes.

17 Q.    What did she say?

18 A.    She had initially asked me if we had removed the

19 baking soda and the mixing bowl from her residence.  I

20 advised her that we did not.

21        She had advised me that that is what Wolfie,

22 the defendant, who was referred to as Wolfie, Darryl

23 Chambers, had used when he was making the crack cocaine.

24 Q.    Other than the fact that this is obviously leaking

25 some baking soda, could you open the bag and tell the

1    Court whether the items are in the same condition and

2    what the significance of those items are for persons who

3    are involved in the distribution and manufacture of

4    crack cocaine?

5    A.    Well, there is one large box, which is a 2-pound

6    box of Arm & Hammer baking soda.  There are also two

7    smaller boxes, which are 8-ounce boxes of Arm & Hammer

8    baking soda.  And there is one large, heavy, glass

9    mixing bowl.

10   Q.    Does the mixing bowl have a size on it, in terms

11   of does it say the number of liters or grams or any

12   volume or density or weight?

13   A.    I'd have to really open it up and it's covered

14   with black powder for the purpose of attempting to

15   obtain latent prints on it.

16   Q.    I'm sorry.  I'm going to need you to do that.

17   A.    Okay.  It's the equivalent of four cups or one

18   quart mixing bowl.

19   Q.    Did Faye Bullock tell you whether or not those

20   items were used by Darryl Chambers at her residence to

21   cook cocaine into crack cocaine?

22   A.    All the items in this bag, which are the baking

23   soda, the mixing bowl and razor blades, were used in

24   the manufacturing from powdered cocaine to crack

25   cocaine, ultimately for the sale.

1    Q.    And Faye Bullock told you that those items were

2    specifically used by Darryl Chambers in that manufacture

3    of cocaine into crack cocaine?

4    A.    That is correct, in the kitchen of her home.

5    Q.    Based upon your training and experience, the baking

6    soda that Faye Bullock gave you, the mixing -- does that

7    say it's a Pyrex mixing bowl?

8    A.    Yes.

9    Q.    The Pyrex mixing bowl and the razor blades, could

10   they be used to manufacture cocaine into crack cocaine?

11   A.    Yes.  And I'd have to say large quantities.

12            MR. PRETTYMAN:  Your Honor, I would move the

13   admission of Government's Exhibit -- I believe that was

14   16 -- into evidence.

15            THE WITNESS:  16.

16            MR. BENSON:  No objection.

17            THE COURT:  All right.  It's admitted.

18   ***      (Government's Exhibit No. 16 was received

19   into evidence.)

20   BY MR. PRETTYMAN:

21   Q.    Detective Sullivan, I neglected to ask you a

22   question earlier about Government's Exhibit 9, which was

23   the substance, I believe, in this pile of evidence right

24   here that were in the little plastic bags with the

25   horses on them.

1          What is the street name for that type of

2    drug?

3    A.    Rocks.

4    Q.    Okay.

5          And is it also called crack cocaine?

6    A.    Rarely.  Everybody that I deal with on the streets

7    of Wilmington usually refers to them as rocks.

8    Q.    And in terms of the way that it's -- its synonym,

9    I guess, for lack of a better word, it's called rock,

10   it's called crack.  It goes by various street names; is

11   that correct?

12   A.    I've heard it probably referred to as crack, rock.

13   Actually, I've heard it called smoke a couple times on

14   the West Side.

15   Q.    Okay.

16         And Government's Exhibit 9 is crack cocaine,

17   based upon your training and experience?

18   A.    Yes.

19   Q.    On May 27th, 1998, did you witness a statement in

20   this building made by the defendant, Darryl Chambers?

21   A.    Yes.

22   Q.    And this statement was made in the presence of his

23   attorney, yourself, another law enforcement officer and

24   me; is that correct?

25   A.    That is correct.

1  Q.    And that statement was taken pursuant to written

2  understanding or agreement between the defendant, his

3  lawyer and the Government that was signed by those

4  three parties; is that correct?

5  A.    That is correct.

6  Q.    I'm going to hand you, after I show it to the

7  defense, a copy.  I've labeled this Government's Exhibit

8  17, the agreement between the parties (handing exhibit

9  to Mr. Benson.)

10             MR. BENSON:  No objection.

11             MR. PRETTYMAN:  Your Honor, I've been told

12  by Mr. Benson that there is no objection to the admission

13  of Government's Exhibit 17, and I would move its

14  admission at this time.

15             THE COURT:  All right.  It's admitted.

16  ***        (Government's Exhibit No. 17 was received

17  into evidence.)

18  BY MR. PRETTYMAN:

19  Q.    Detective Sullivan, Government's Exhibit 17 are

20  the conditions of that statement that you took in the

21  presence of his attorney, myself and another law

22  enforcement officer; is that correct?

23  A.    Yes.

24  Q.    And before that statement was made, was the

25  defendant advised of his Miranda rights?

1  A.    He was.

2  Q.    Who advised him of those rights?

3  A.    I did.

4  Q.    Tell the Court what rights you advised the

5  defendant before his statement.

6  A.    I had orally advised him of his Miranda warnings.

7  I had asked him or stated Darryl Chambers, you have the

8  right to remain silent.  Anything you say can and will

9  be used against you in a Court of law.  You have the

10  right to an attorney.  If you cannot afford an attorney,

11  one will be appointed to represent him before any

12  questioning, if you wish.  Do you understand each of

13  the rights I have just explained to you?

14          He acknowledged orally, yes.

15          I then asked him that with his rights in mind

16  if he wished to speak to us, and he did.

17  Q.    And this was all done in the presence of his

18  attorney; is that correct?  Mr. Benson?

19  A.    Yes.

20  Q.    Were there any threats, other promises besides the

21  ones mentioned in Government's Exhibit 17, or any force

22  used to make the defendant waive his rights or to speak

23  with us that day?

24  A.    None.

25  Q.    What did the defendant say about the cocaine and

1    crack cocaine that he possessed with intent to distribute

2    during the time period of the conspiracy charged in this

3    case with Faye Bullock and Linette Crawford?  That is

4    July 1997, on or about -- to on or about December 8th,

5    1997?

6    A.    He had stated that he never contested the amount.

7    The only part of the interview that he disagreed with

8    was the amount of crack cocaine.

9    Q.    I think it might be easier for the Court's

10   understanding is to explain what the defendant said.

11   And then you can say what he admitted or denied in terms

12   of quantities and substance.

13          MR. BENSON:  Your Honor, presuming that this

14   statement was recorded for the accuracy of it, that

15   would probably be the best way for the Court to

16   understand it.  If it wasn't recorded, then I guess

17   it's going by his recollection as opposed to the

18   defendant's recollection of what was said.

19          MR. PRETTYMAN:  It was not tape-recorded,

20   your Honor.

21          THE COURT:  If that is an objection, it's

22   overruled.

23          MR. PRETTYMAN:  Thank you, your Honor.

24   BY MR. PRETTYMAN:

25   Q.    Detective Sullivan, could you tell the Court what

1    you recall being said by the defendant, in terms of the

2    substances, the quantities of cocaine and crack cocaine

3    that he possessed with intent to distribute as part of

4    the conspiracy with Linette Crawford and Faye Bullock

5    during July -- on or about July 1997 to on or about

6    December 8th, 1997?  And do it in such a way as you know

7    what statements were made by the defense, what he

8    admitted and what he denied, please.

9    A.    Okay.  The defendant had stated that he had

10   distributed cocaine and crack cocaine from Faye Bullock's

11   house.  He had described when or how he had met Faye,

12   how he started to use her home, and the -- the fact that

13   he did admit to cooking or making, in his own words,

14   crack cocaine.

15   Q.    At the beginning, he called it cocaine base.  And

16   then when questioned on it, he admitted that he had

17   cooked the cocaine into crack cocaine; is that correct?

18   A.    That is correct.

19   Q.    And did he indicate during what time period that

20   he was cooking the cocaine into crack cocaine at Faye

21   Bullock's house?

22   A.    Yes.

23   Q.    What did he say?

24   A.    He had stated that he had never done it before,

25   referring to cooking crack cocaine, until after

1    Thanksgiving, because he was in need of some extra

2    money.

3    Q.    That was on or about Thanksgiving of 1997; is

4    that correct?

5    A.    That is correct.  That he had simply only sold

6    powder.

7    Q.    Did he indicate how much, what quantity of cocaine

8    that he had cooked into crack cocaine to possess with

9    intent to distribute during this time period?

10   A.    If my memory serves me correctly, the defendant,

11   in front of his attorney, had stated that it might have

12   been 4 ounces.

13   Q.    4 ounces of crack cocaine?

14   A.    Total.

15   Q.    And an ounce is 28 grams?

16   A.    Yes.

17   Q.    Actually, it's a little more than 28 grams; is

18   that correct?

19   A.    It's 28 grams per ounce.

20   Q.    All right.

21            Did the defendant also make statements about

22   the quantity of cocaine hydrochloride that he possessed

23   with intent to distribute as part of the conspiracy

24   involving Faye Bullock and Linette Crawford during on or

25   about July 1997 until on or about December 8th, 1997?

1    A.    Yes.   Again, this is from my memory and I think I

2    have a pretty good memory.  According to the defendant,

3    if it was a good month, and then we would go back and

4    forth.  There was a total agreed upon by the defendant

5    and the investigators that the 20 kilos of cocaine,

6    powdered cocaine, was an accurate amount.

7    Q.    Okay.

8              And he stated, did he not, that he purchased

9    and sold as part of that conspiracy between 15 to 20

10   kilos of cocaine, but that it was done in a six-month

11   period with a good month being that he possessed with

12   intent to distribute and distributed 4 kilos, kilograms

13   of cocaine hydrochloride, and during a bad month, he

14   would possess with intent to distribute and distribute

15   3 kilograms of cocaine hydrochloride?

16             MR. BENSON: Your Honor, I'm going to object

17   again, only because it seems to me that the Assistant

18   U.S. Attorney is testifying as opposed to the witness

19   on the stand.  He is telling him now what Mr. Chambers

20   has said as opposed to what he said.  The detective

21   has indicated --

22             THE COURT:  You can cross him on it.

23             MR. BENSON:  Your Honor, once he knows the

24   answer, it's difficult to cross-examine him on it.

25   He's being told what the answer is, so it's tough to

1    cross-examine him when it's already put in his mind

2    what happened at that meeting.

3              THE COURT:  Well, I still think you can put

4    it in the context of cross.

5              MR. PRETTYMAN:  Thank you, your Honor.

6    BY MR. PRETTYMAN:

7    Q.    Is that correct?

8    A.    If it will help Mr. Benson, from your client's

9    mouth, on a bad month, he did 3.  On a good month, 4.

10   And out of the 20 kilos that we came to an agreement

11   on, that he did 4 ounces of crack cocaine, which was

12   made after Thanksgiving.  That's my memory.

13   Q.    When you say three or four, were you referring to

14   kilograms?

15   A.    Kilos, because there was some discrepancy about

16   the good month and the bad month.

17   Q.    I think we're up to Government's Exhibit 18 now.

18   Was 17 the agreement?

19   A.    Right.

20   Q.    Did you write a report based upon your recollection

21   of the conversation that you had with the defendant in

22   the presence of his attorney and myself and another law

23   enforcement officer that we've been discussing?

24   A.    I did.

25              MR. PRETTYMAN:  Your Honor, I am going to

1   show this, Government's Exhibit 18, to Mr. Benson.  He

2   has a copy already.  I will move its admission (handing

3   exhibit to Mr. Benson.)

4                (Pause while Mr. Benson reviewed the exhibit.)

5                MR. BENSON:  Your Honor, if the question to

6   me is whether or not I object to the admission of this

7   as being a report prepared by Mr. Sullivan, Detective

8   Sullivan, I don't object to it.

9                As to the accuracy, certainly, I take

10  substantial issue.

11               THE COURT:  All right.  It's admitted.

12               MR. PRETTYMAN:  Thank you, your Honor.

13  ***          (Government's Exhibit No. 18 was received

14  into evidence.)

15  BY MR. PRETTYMAN:

16  Q.    Detective Sullivan, Government's Exhibit 18 is the

17  report that you prepared based upon your recollection of

18  the meeting between the attorney, myself and the law

19  enforcement officer?

20  A.    That's correct.  This is referred to as a 302

21  report.  It was authored by me.

22  Q.    Detective Sullivan, as part of your training and

23  experience, have you seen defendants use multiple stash

24  houses in order to make sure all their drugs aren't in

25  one place that could be seized by law enforcement

1    officers?

2    A.    Yes.

3    Q.    And is the fact that a percentage of the drugs that

4    were actually being seized -- that were actually seized,

5    does that, based upon your training and experience, the

6    seizure of drugs at one house, does that always indicate

7    the quantity of drugs that a person is involved with

8    selling?

9    A.    No.

10            MR. PRETTYMAN:    Thank you, your Honor.    I have

11   no further questions.

12                    CROSS-EXAMINATION

13   BY MR. BENSON:

14   Q.    Detective, the lab report indicates, I believe,

15   which I'm not sure what Government exhibit it is, but

16   it's the lab report that refers to the quantity of drugs

17   that were seized at Faye Bullock's house.    10-F.  Do you

18   have that in front of you?

19   A.    No, sir, I do not.

20   Q.    Okay.

21            Well, it indicates, according to Chemist

22   Dasgupta, that there was a total weight of cocaine of

23   265 grams and a total weight of crack of 6.38 grams.

24            Do you take issue with that?

25   A.    What's the total of powder and crack?

1    Q.    265 grams of cocaine and the total weight of crack

2    is 6.38 grams.

3    A.    Okay.

4    Q.    Do you agree with that?

5    A.    Yes.

6    Q.    Okay.

7          And that was seized that evening when Darryl

8    Chambers was arrested?

9    A.    December 8th, 1997.

10   Q.    December 8th.  Okay.

11         What time was he arrested?

12   A.    I don't have the exact time.  I'd have to look at

13   the crime report, see what time we made entry, and the

14   time that he was secured in the bedroom.  But I believe

15   it was about 2230, about 10:30 p.m.

16   Q.    10:30.

17         And whatever business he had been

18   transacting, he had closed down for that particular

19   night; isn't that correct?

20   A.    No, sir.

21   Q.    He was still working?

22   A.    It's my understanding he was at the back door when

23   we were making our exit from the van and ran into the

24   house and up the stairs, into the bedroom.

25   Q.    Well, where were the drugs found?

1  A.    In the kitchen and in the overhang at the back

2  door.

3  Q.    And how far were you when you started to enter

4  the house?  In other words, when you exited the van?

5  A.    On Bowers Street?

6  Q.    Yes.  I mean, how many feet would that have been?

7  A.    I'd have to give you an approximate.  Maybe from

8  here to the divider (indicating).  30, 40 feet, max.

9  Q.    So would it be safe to say he certainly wouldn't

10  have had time to hide or dispose of the drugs and run

11  upstairs in those 30 or 40 feet by the time you exited

12  the van and ran into the Bowers Street house; isn't

13  that correct?

14  A.    I don't think he did try to hide.

15  Q.    I mean, so the drugs were -- wherever they were

16  found, that's where they had been?

17  A.    Yes.

18  Q.    Okay.

19          He had no drugs on him?

20  A.    No, sir.

21  Q.    You found no drugs lose in the house anywhere in

22  either -- hidden under a sofa, pillow, or anything like

23  that; isn't that correct?

24  A.    No.  We did find drugs concealed in a kitchen

25  cabinet.

Sullivan - cross                          47

1   Q.    In a kitchen cabinet, right, which is consistent

2   with what Faye indicated to you where the drugs were

3   kept when they are not being sold?

4   A.    No.  They were stored in the kitchen, and when the

5   shop was open, when the drugs were being sold, they were

6   kept in the overhang at the back door.

7   Q.    And that is where they were?

8   A.    Yes.

9   Q.    And you found some of them?

10  A.    Yes, sir.

11  Q.    Referring to Government's Exhibit 10-D, you

12  indicated that the -- that that was powder cocaine.  You

13  felt the bag?

14  A.    Do you mind if I take a look at it again?

15  Q.    No.  Go ahead.

16  A.    Yes.  This is the one that has the appearance

17  that's rocky, but actually it's what I know as to be --

18  it looks like it's just chipped off the block or with a

19  kilo, but it's actually powder cocaine.

20  Q.    So someone without any experience certainly feeling

21  that could very easily get the impression that that was

22  crack as opposed to powder; isn't that correct?

23  A.    I don't know who you're referring to as without

24  no experience.

25  Q.    I'm not talking about police; I'm talking about a

1    citizen, a person.  If they believe that crack is rock,

2    as its street name is, or hard and chunky feeling, that

3    certainly would give you the impression that that met

4    that criteria, wouldn't it?

5    A.    I can't -- I can't answer for someone else's...

6    Q.    Well, didn't you testify just a moment ago that,

7    in fact, it feels like crack, but it is, in fact,

8    powder?

9    A.    I said it has the appearance of being a rocky

10   substance.  Once you squeeze that, it will break down,

11   which crack cocaine will not.

12   Q.    But isn't that consistent with crack?  Appearance

13   of a rocky substance or hard substance?

14   A.    Yes, it can.

15   Q.    Okay.

16          Now, talking about these peanuts, as you

17   referred to, you indicated that Defense Exhibit 1 is

18   similar to what Linette indicated was the peanut that

19   she described and drew for you; isn't that correct?

20   Smaller, however?

21   A.    No.  I believe I stated that, from my experience

22   and training, what was described to me by Linette, that

23   10-G was more consistent than Defendant's Exhibit 1.

24   Q.    Well, 10-G, let's talk about that.  That is what

25   is --

1         MR. BENSON:  May I approach, your Honor?

2         THE COURT:  All right.

3  BY MR. BENSON:

4  Q.    This is -- 10-G is the one that -- what is the

5  weight of this?

6  A.    Prior to packaging, it was weighed, substance alone

7  is 1,000 grams.

8  Q.    Which is a --

9  A.    The equivalent of a kilo substance.

10 Q.    Did you have Faye or Linette hold something similar

11 to that?

12 A.    Did I?  No.

13 Q.    Or did anyone, that you are aware of?

14 A.    No, sir.

15 Q.    So what did they say that made you believe that

16 that would be consistent with what they allegedly

17 observed Darryl Chambers transporting or having, a key

18 at a time?

19 A.    Again, the way it was described to me.

20 Q.    Well, how was it described to you, I guess is my

21 question?

22 A.    And, again, I can go from my recollection of what

23 my memory is, and it was described like that (indicating)

24 and like that (indicating).

25 Q.    Well, according to what Linette testified to and

1    also what I think appears in her statement concerning --

2    at the time of her sentence, she indicated it was the

3    packaged peanut, she referred to, was about six or seven

4    inches long, about two or three inches wide at the end,

5    going down to about an inch in the middle.

6                    Do you remember that?

7                    Your memory, as good as it is -- you keep

8    reminding us how good it is -- is that consistent with

9    what your memory is?

10   A.    Yes, sir.

11   Q.    Okay.

12              So --

13              MR. BENSON:  May I again, your Honor?

14              THE COURT:  All right.

15   BY MR. BENSON:

16   Q.    So now as I'm understanding what you are telling

17   me is that this is more consistent with what Linette's

18   description of the drugs are, in that you are telling us

19   that this is about six or seven inches long, it's about

20   two or three inches wide at the end, and it slants down

21   into about an inch in the middle.

22                    Is that consistent with what Linette's

23   testimony was and what she described to you?

24   A.    Yes, sir.

25   Q.    This is (indicating)?

1  A.    What she described.  That's how she described it.

2  Q.    You think this is an inch in the middle?  You think

3  this is two or three inches wide at the end?  That's what

4  I'm asking you.

5  A.    At the end?  I do, yes.

6  Q.    How about in the middle?

7  A.    Slightly over an inch.  Probably about two inches.

8  Q.    Did you have her hold any of these things to

9  determine weight?

10  A.    No, sir.

11  Q.    Okay.

12          Did you have her hold anything equal to a key

13  of weight to determine what she was carrying for Mr.

14  Chambers?  This is Linette I'm talking about.

15  A.    No, sir.

16  Q.    So, basically, what you are going by, and what you

17  are asking the Court to accept as your testimony is that

18  Linette tells you that she doesn't know weight, she

19  doesn't know keys, she doesn't know grams, she doesn't

20  know pounds, she doesn't know any of these things;

21  right?  She emphasized this to you a number of times;

22  isn't that correct?

23  A.    As you know, she is not a very -- to put it

24  bluntly, a very intelligent individual.

25  Q.    Believe me, I know that better than you after

1    yesterday.  But what I'm saying to you is that she

2    consistently said that; isn't that correct?

3    A.    Her description --

4    Q.    No.  Excuse me.  I don't mean to interrupt you.

5    But she consistently said she doesn't know weight, she

6    doesn't know keys, she doesn't know pounds, she doesn't

7    know ounces, et cetera.  She was describing to you what

8    she was transporting for Mr. Chambers, and she described

9    it as being about six or seven inches long, shape of a

10   peanut, two to three inches wide at the end, going down

11   to about an inch in the middle; right?

12   A.    That's consistent.

13   Q.    That's consistent with what she said.

14            Now, would you not agree that the weight,

15   while we agree on the size, the weight, as you

16   demonstrated it by the Government exhibits, could be

17   anything?  In other words, this smaller one that was

18   packaged by someone other than yourself, I don't even

19   know what this weighs, but probably five pounds, maybe,

20   or something.  I mean -- no?  Three pounds?  I mean --

21   you tell me what you think it weighs.

22   A.    I don't know the weight, because I didn't weigh it.

23   I don't know what's inside of it.

24   Q.    You have an estimate, don't you, an opinion?

25   A.    My estimate is probably double this.  So if this

1    is around 2.2 pounds, that's probably at least 4 pounds.

2    Q.    Okay.  I said five.  Something like that.  Okay.

3          This feels like it's more than double this,

4    but in any event...

5          So the point being, Officer, that if you

6    look at those three packages, you can't, by the size of

7    the package, determine the weight or the quantity of

8    the drugs that are being packaged; isn't that correct?

9    A.    I can't tell you what the weight was because I

10   wasn't there.  I didn't weigh it.

11   Q.    Exactly.

12         And no one can?

13   A.    No, sir.

14   Q.    Right?

15   A.    No one but your client.

16   Q.    Exactly.

17         So he has the best information as to the

18   weight involved.

19         Now, Faye and Linette, or Linette especially,

20   was saying that she was transporting for Mr. Chambers

21   these peanuts.  You're suggesting that that one peanut

22   is consistent with her drawing, which the Judge will

23   make that ultimate determination, I guess.  And that

24   weighs a key.

25         The peanut that we prepared, Defense

1    Exhibit 1, weighs a quarter-key.

2             Linette testified that our example -- and

3    she held our exhibit.  She said that was a little small.

4    She said that she thought that the peanut, as she put

5    it, that Darryl had and that she transported, was bigger

6    than that.  She did not, that I remember, indicate that

7    she had any problem with the weight of the exhibit.

8             So, again, the point being that, looking at

9    those three items, you can't determine the weight?  I

10   mean, those weights are very inconsistent with the way

11   they're packaged; isn't that correct?  I mean, the

12   smaller item happens to go the heavier one.

13   A.    I don't know the weights.  Again, I did not weigh

14   it.  I was not there.  Again, your client --

15   Q.    No.  I'm talking about those three exhibits that

16   are there.

17   A.    I can only go by my experience and training and

18   what was described to me.  And I think there was another

19   example that we referred to that particular day, which

20   was a basket, to show size.  But, I mean --

21   Q.    Did you fill up the basket?  Do you remember?

22   A.    No.

23   Q.    No.  Exactly.  There was a basket.  Linette

24   testified to this somewhat.  There was a basket at the

25   FBI, I guess on the table, and you are asking her, is

1   this the size of the package?  She says yes, something

2   to that effect.

3   A.     No.  I can tell you from my memory --

4   Q.     Go ahead.

5   A.     -- as we want to go back to again --

6   Q.     Sure.

7   A.     -- was that she was to give us an example and she

8   looked around the room and she said about the size of

9   that.

10  Q.     Right.

11  A.     And pointed to a wicker basket that was on the

12  table.

13  Q.     Okay.

14         But, again, that was the size of the package,

15  not the weight of the package.

16  A.     You keep bringing up weights.  I can tell you, I

17  don't know the weights.  None of us do.

18  Q.     I understand, but that's the whole point.  This

19  is a case about weights, isn't it?

20  A.     And I can tell you --

21  Q.     This is a case about quantity?

22  A.     Exactly.

23  Q.     So --

24  A.     And from looking at this and looking at this and

25  from the descriptors and her giving the motion with her

1  hand, that from my experience and training would dictate

2  that this was -- that this is more indicative of what

3  she was describing than this is (indicating)

4  Q.    But you're telling us, and you want the Judge to

5  accept, that that represents her description, the item

6  that you prepared this morning at the FBI office is six

7  or seven inches long, three -- two to three inches wide

8  on the end and one inch wide in the middle.  And you are

9  saying that that is consistent with that description?

10  You want the Judge to believe that?

11  A.    No.

12  Q.    We're just looking at it.

13  A.    I'm also relying on the fact that your client

14  admitted to me that he did 15 to 20 kilos.  This is a

15  kilo (indicating).  That in conjunction with what she

16  told us at the meeting is supportive to what my opinion

17  is.  That's all I can go on, Mr. Benson.

18  Q.    But you did not have her hold anything or weigh

19  anything or pick up anything that would be consistent

20  with that; isn't that correct?

21  A.    I'm really going on my experience and training, the

22  interview with your client and the interview with both

23  girls --

24  Q.    Right.

25  A.    -- led me to believe that this is not an accurate

1   description of what was being transported.  That your

2   client admitted to doing 15 to 20 kilos, that this is

3   an accurate depiction of a kilo, which was weighed by

4   me this morning.

5              MR. BENSON:  May I have the Government's

6   exhibit of the drawing?  Who has that?

7              Oh, it's up there?

8              THE WITNESS:  Which --

9              MR. BENSON:  The original drawing?

10             THE WITNESS:  No.  I'm sorry.  It's here.

11             MR. BENSON:  All right.

12  BY MR. BENSON:

13  Q.   Now, Linette testified, under oath yesterday, that

14  this inner line, peanut --

15  A.   Yes, sir.

16  Q.   -- was the one that was always what Darryl gave

17  her to transport.  That on one occasion -- this is her

18  testimony -- that there was a bigger peanut.

19             Did she ever suggest that to you?  Did she

20  ever tell you that?  When she drew these two lines, didn't

21  she tell you that the smaller inside line was the one

22  that was more consistent with the -- the packaging of the

23  drugs that she transported for Darryl?

24  A.   No, sir.

25  Q.   Well, I'm telling you that she -- well, strike that.

1            What was the reason for the two lines

2    (handing exhibit to the witness)?

3    A.    The two lines were at different times the smaller

4    peanut was transported and at times the larger peanut

5    was transported.

6    Q.    Did she tell you how many times she transported

7    the larger peanut, as you put it?

8    A.    I don't recall.  I do want to say there was -- I do

9    recall, my memory again, that sometimes -- again,

10   sometimes -- and, again, you know as well as I do when

11   you are dealing with uneducated, low-income individuals,

12   that they cannot articulate certain things, and that,

13   when we try to get an assumption or the best estimate

14   that we could, was that the smaller peanut was

15   transported sometimes and the larger peanut was

16   transported sometimes.

17   Q.    Well, yesterday she testified under oath, and I

18   presume when you questioned her she wasn't under oath,

19   was she?

20   A.    No, but --

21   Q.    Okay.

22   A.    -- I don't think she was coerced either.

23   Q.    Do you think she was coerced under oath yesterday?

24   A.    I would hope not.

25   Q.    Yesterday she testified under oath that on one

1    occasion, she transported the -- what she characterized

2    as the large peanut, whatever that means.  I mean, I

3    don't know what is the weight of that.  But that's on

4    one occasion.  The other times were the smaller peanut.

5              Now, would you not agree that the defense

6    exhibit is more consistent with this smaller peanut

7    drawing than what your drawing is, or that what your

8    exhibit is?

9    A.    Actually, it's a little smaller than your exhibit.

10   Q.    The smaller peanut is.  Okay.

11             And if I represent to you -- well, do you

12   have an estimate by picking that up as to the weight of

13   that defense exhibit?

14   A.    My estimate?

15   Q.    Yes.

16   A.    With the tape?

17   Q.    With, without, whatever.

18   A.    Well, it depends, because --

19   Q.    Okay.

20   A.    -- this is a kilo without the packaging.

21   Q.    Okay.

22   A.    With the packaging, it's 1,022 grams.

23   Q.    Okay.

24             What about that one?

25   A.    You're asking me the total weight?

Sullivan - cross                    60

1    Q.    Yes.

2    A.    Or just a substance?

3    Q.    The total weight.

4    A.    I don't know.  Maybe 4-1/2 ounces.

5    Q.    About a quarter-key?

6    A.    Close.

7    Q.    Yes.  Okay.

8          Well, that's all right.

9          So -- and you're saying that that -- do you

10   not agree that that is consistent with the smaller

11   drawing that Linette provided you?

12   A.    It's close.

13   Q.    Okay.

14          And Linette testified yesterday that the

15   smaller drawing peanuts are the ones that she typically

16   transported.  That on one occasion, she had transported

17   the bigger drawing peanut.  I'm telling you that.

18   A.    See, you're confusing me now --

19   Q.    Go ahead.

20   A.    -- because she said she transported peanuts,

21   which would be one of these.

22   Q.    Over periods of time.  Yes.  That's right.

23   A.    Well, I'm a little confused on that, then.

24   Q.    Okay.

25   A.    You're saying that in the bag when she was

1   transporting, there was only one peanut?

2   Q.    Well, she testified that she looked in -- I will

3   represent to you that she testified yesterday that, on

4   occasion, she would look in the bag, not every day.

5   And that, on occasion, there would be, like, a peanut

6   and maybe some side drugs and package, whatever, all

7   wrapped, whatever it might be, that type of thing.

8               Sometimes there would be more than one

9   peanut.

10  A.    Okay.

11  Q.    But that would be typically the size of the peanut.

12              Now, she also -- did she indicate to you, or

13  did you question her about the -- how often she would be

14  transporting these drugs to Mr. Chambers?

15  A.    We did, and, again, we're going back to the memory.

16  Q.    Sure.

17  A.    Bank here.  And that was that -- once she was hired

18  or she was brought on board or she was asked for

19  assistance when it got hot, which -- meaning the cops or

20  one time, or whatever you want to call them, were in the

21  area, that she was asked to hold onto the package or the

22  PK or the pack, whatever you want to call it.  That once

23  she was en route, in a regular routine she was doing on

24  a daily basis, except for Sunday, when Wolfie didn't

25  work.

1    Q.    Well, yesterday she testified that three or four

2    times a week she would bring drugs to Faye's house.

3    Is that consistent with what she told you?  That's also

4    in the 302 I think that was prepared.

5    A.    I haven't reviewed that at all today, but that

6    would be consistent with daily.

7    Q.    Three or four days is daily in your mind?

8    A.    Yeah.

9    Q.    It seems to me if he doesn't work on Sunday, then

10   daily is six days a week.

11   A.    Okay.

12   Q.    She's saying -- she's indicating in a 302 on

13   December the 15th that it was three or four days a week,

14   which is half of what you are saying.

15   A.    Well, again, we can go -- four is over half.

16   Q.    You understand?

17   A.    I understand.

18   Q.    The point is it's not every day?

19   A.    Again, I'm telling you what my memory is.  I have

20   not reviewed my report today.

21   Q.    Your memory, at least in that respect, is faulty?

22   A.    By one day, two days.

23   Q.    Or three days?  So it could be off as much as 50

24   percent?

25   A.    Well, then we're going into assumptions here.

1    Four days, I'm off by two.

2    Q.    If it's three days and you just said six, you're

3    off by half, aren't you?

4    A.    By three.

5    Q.    Okay.

6              Now, did Linette tell you how the drugs got

7    back to her house in the evening, after Darryl was

8    finished business?

9    A.    Yes, she did.  And, again, this is memory.

10   Without looking at the report, it was usually --

11   sometimes Wolfie would drop them off, I believe, or -- I

12   want to say, again, my memory is that Faye would bring

13   them over.

14   Q.    Let me suggest to you that the testimony from

15   Linette yesterday was that on many occasions -- I think

16   her word was a lot of occasions -- she would be at

17   Faye's house with Wolfie.  And she and Faye would be

18   doing things, and that when business closed down, on a

19   lot of occasions, to use her words, she would just --

20   the drugs would be packed up and she would take them

21   back to her house that night.

22              Does that help refresh your memory about

23   anything?

24   A.    No, sir.

25   Q.    Okay.

1          She never told you that?

2    A.    She could have.  I don't remember that.

3    Q.    Okay.

4          Now, certainly, if that were the case -- let

5    me suggest to you, if she transports a quarter-key to

6    Faye's house for Wolfie, she spends the night there, or

7    stays there, he does his business.  He then rewraps the

8    drugs, gives them to her, and she takes them home.  Say

9    she comes back with an eighth of a key the next night.

10   They're the same drugs, aren't they?  That's the same

11   quarter-key, isn't it?

12   A.    It depends if it was cooked up or if it's still

13   powder.

14   Q.    Forgetting the crack aspect of it, we're just

15   talking about powder right now.

16   A.    Okay.

17   Q.    So that's not a quarter-key or a half a key that

18   she brought one night, then the next night she brings

19   another half a key?  That's the same half key that she's

20   bringing back, isn't it?  If there's not a replenish.

21   Of the drugs --

22   A.    I don't know, because I don't know if there was

23   more than one in that bag.  I don't know which key it

24   could have been.  I don't know.

25   Q.    I understand.  But the point I'm making is whatever

1    she transported on a Tuesday night, we'll say, to Faye's

2    house, and if she happened to stay there, as he indicated

3    she did a lot of times, and Wolfie sold some portion of

4    those drugs, because, clearly, Linette's testimony to you

5    is that she was never there, other than on two occasions,

6    when Wolfie cooked crack; isn't that true?

7    A.    That's correct.

8    Q.    That you remember.

9         So if she's there a lot of times and a lot

10   of nights, clearly, Wolfie is not cooking crack while

11   she's there.

12        MR. PRETTYMAN:  Your Honor, this is argument,

13   closing statement for defense as opposed to asking the

14   officer his opinion on various things.

15        THE COURT:  I don't mind.  That's okay.

16        MR. BENSON:  Thank you, Judge.

17   BY MR. BENSON:

18   Q.    Do you understand the question?

19   A.    I understand you're asking me to assume a lot of

20   things.  I don't know.  I wasn't there.

21   Q.    I understand.  The question is:  Did you question

22   Linette about whether or not the drugs were being

23   replenished?  And if so, by whom?

24        In other words, there's a key of powder.

25   Wolfie beeps her.  She takes the key in the bag with the

1    scale to Faye's house.  She sits around.  He does

2    whatever he's going to do.

3              Now, the one thing you know from Linette's

4    testimony is he wasn't cooking crack when she was

5    there, other than on two occasions; right?

6    A.    Correct.

7    Q.    Okay.

8              Now, that's not an assumption, that's a

9    fact based on your investigation, talking with Linette?

10   A.    Yes.

11   Q.    Okay.

12             So now he does whatever he's doing.  He

13   sells some powder.  He rewraps it, hands it to her.

14   She takes it back to her house.

15             Wednesday night comes up.  He beeps her.

16   She comes back up with the drugs wrapped.  She hangs

17   out with Faye.  He does his business.  Rewraps the

18   drugs, gives them to her, takes them back.

19             Thursday night, beeps her.  Comes up.  She

20   leaves.  He sells his powder, wraps it up.

21             Now, he goes and takes it back to her, to

22   Linette.  She's home.

23             Now, did you question her about whether at

24   any time were these drugs, this original key that we're

25   talking about, replenished?  In other words, isn't it

1   possible, Officer, from your investigation, that it was

2   the same key that was going up to Faye's house for three

3   nights or four nights?  I mean, isn't that possible?

4   A.    I can't tell you which -- I can't answer that,

5   because I have two different sources.  I have your

6   client's and then I have the two girls.

7   Q.    I'm asking you if it's possible?  That's yes or

8   no?

9   A.    If it's the same kilo?

10  Q.    Yes.

11  A.    Sure, it's possible.

12  Q.    Okay.

13        So that when Faye is telling you, or telling

14  someone that, in fact, there were -- by the way, let me

15  ask you this concerning Faye Bullock.  Did you show her

16  these peanuts?  Did she ever describe what Linette was

17  transporting as being peanuts?

18  A.    I don't recall that.

19  Q.    So was she questioned about how the drugs were

20  wrapped and what she observed?

21  A.    Yes.

22  Q.    And what did she say she observed?

23  A.    That they were in silver -- what was described to

24  be as duct tape.

25  Q.    And did you ask her the shape that they were in or

1    did they remind her of anything?

2    A.    Yes.

3    Q.    And what was that?

4    A.    Things -- I mean, again, you're dealing with the

5    element of low-income housing.

6    Q.    Low-income housing has nothing to do with

7    intelligence.

8    A.    It does with Faye.

9    Q.    I don't know where you get that analysis, that

10   somebody is poor, they have to be stupid.  The point is

11   they may be dumb, and I'm not going to argue that with

12   you, or unintelligent, but the fact of what their

13   income level is is irrelevant in my mind.

14             In any event, you're talking about these

15   people that have very little education.

16   A.    Mm-hmm.

17   Q.    And probably a little intelligence.  Now, go ahead.

18   A.    She did not ever bring up a peanut.  She was asked

19   to describe it.  And during the description of that, it

20   was agreed that it was the size of a Domino Sugar box.

21   Q.    It was agreed by whom?  By Agent Cobb?

22   A.    And Faye Bullock.

23   Q.    Who suggested the -- the sugar box?

24   A.    She described it initially and then Agent Cobb

25   tried to find something that would match her description.

1    Q.    Did he point to a television set?

2    A.    No, I don't think a television was ever brought

3    into the picture.

4    Q.    I'm just trying to think of something that creates

5    a large impression.

6    A.    Well, that could be 20 kilos.

7    Q.    That could be.

8              This is the sugar box (indicating)?

9    A.    Yes.

10   Q.    Okay.

11             And this is a pound?

12   A.    I believe that's a one pound box, yes.

13   Q.    She said -- did she -- were you there when she was

14   questioned by Agent Cobb?

15   A.    I was.

16   Q.    Did she hold this sugar box and say, Yes, this is

17   about the weight?  Do you remember that?

18   A.    My recollection was that was the size, which was

19   later -- again, she described that she had done one of

20   each, one powder and one crack.

21   Q.    She had done?

22   A.    That -- in her house.

23   Q.    Yes.

24             THE COURT:  Why don't we take a break in a

25   couple minutes, so when you find a spot?

1            MR. BENSON:  Why don't we do it now, Judge?

2            THE COURT:  We'll take a 15-minute break.  I

3   will be back at ten of.

4            (Short recess taken.)

5                        - - -

6            (Court resumed after the recess.)

7

8            THE COURT:  All right.

9            MR. BENSON:  Ready, Judge?

10  BY MR. BENSON:

11  Q.    Detective, when we broke, we were talking about, I

12  guess, Faye Bullock and the fact that she indicated to

13  you and to Agent Cobb that her recollection of the

14  packaging of the drugs that she observed was similar to

15  the Domino sugar box; is that right?

16  A.    That's correct.

17  Q.    And she indicated also, I think in her testimony

18  as well as the 302, that it was about -- that it was

19  equal to one pound; is that right?  Do you remember

20  that?

21  A.    Everybody came to that agreement, yes.

22  Q.    Do you remember who initiated the discussions

23  about the weight?  Whether it was Faye or was it Agent

24  Cobb or yourself?

25  A.    The way it was -- or the way it came about was

 1  that Faye Bullock was asked, again, to describe the

 2  package or packages that she, meaning Faye, either

 3  observed or had contact or had touched at one point or

 4  another during the time frame.

 5  Q.    Right.

 6  A.    She would, again, physically, with her hands,

 7  describe it and go like that (indicating).

 8  Q.    Right.

 9  A.    And we were looking, again, like we did with the

10  basket, to find something to compare it to.

11            At one point, Agent Cobb had come up with

12  the Domino box and Faye Bullock had agreed that that

13  was an accurate, I guess, depiction of what she was

14  describing being this box.

15  Q.    All right.

16  A.    And, again -- and the investigators, including

17  myself, that that was consistent with what was being

18  told with Linette.

19  Q.    Now, that's consistent, you say?

20  A.    Well, this -- if you look at the peanut and if you

21  look at what Faye was describing that she was doing one

22  and one, one powder and one crack, and if you put two of

23  these boxes together and you put this together, that's

24  pretty close in my eyes.

25  Q.    Well, what Faye is telling you is that Darryl was

1    cooking up all this crack at the house; isn't that

2    correct?

3    A.    I hear you say cooking up what?

4    Q.    Crack at the house?

5    A.    That's correct.

6    Q.    Yes.  All right.  We'll get to that in a second.

7              But basically, to get back to this, Faye, in

8    her 302, indicated that she thought that Darryl was

9    doing, like, four of those boxes a week, which would be

10   four pounds; is that right?  Which would be one key of

11   powder and one key of crack?

12   A.    Correct.

13   Q.    And that would have started sometime in October;

14   isn't that correct?

15   A.    According to Faye Bullock, yes.

16   Q.    Yes.

17              So October and November would be about

18   eight weeks; isn't that correct?

19   A.    Yes.

20   Q.    Now, didn't Faye also indicate to you that, for two

21   of those weeks, Darryl was not doing anything because he

22   had been shot?

23   A.    The discussion about him being shot was brought up.

24   I don't remember about the two weeks.  There was a time

25   frame where it was described as he shut down.

1   Q.    Okay.

2   A.    I don't remember her saying two weeks.

3   Q.    Well, let me suggest to you that yesterday under

4   oath she testified that it was for two weeks.

5   A.    That's fine.  I just don't recall her saying that

6   to me.

7   Q.    Do you agree that even with Faye's testimony, that

8   Darryl did not start cooking crack until sometime in

9   October?

10  A.    And, again, we're going back to my memory, is that

11  once Faye was solicited for her house, that shortly

12  after that is when Darryl or Wolfie began to cook the

13  crack.

14  Q.    Right after you say?

15  A.    I believe it was described as shortly after, which

16  is the same.  Right after, shortly after, thereafter.

17  Q.    Okay.

18         Do you know when Wolfie started going into

19  Faye's house or started -- made the agreement with Faye?

20  A.    I have a pretty good memory.  I don't have the

21  best.  I'd have to look at the report on the date.

22  Q.    If I suggest to you that it was sometime in

23  September, does that help?

24  A.    September rings a bell, yes.

25  Q.    Around the middle of September?

1   A.    If you're suggesting that, then Mr. Benson, I will

2   take you on your word.

3   Q.    No, no.  I'm not giving you my word that that is

4   it.

5   A.    I didn't think you would.

6   Q.    I'm asking you if that's helping your recollection

7   or refreshing any memory?

8   A.    September does again.  I'd have to look at my report

9   and see what's in there.  I can only tell you what I

10  recall.

11  Q.    And you recall it was September, and it could have

12  been the middle of September.

13        Do you recall Faye telling you that a number

14  of weeks when they initially made contact that Darryl

15  stayed outside and sold drugs?

16  A.    That is correct.

17  Q.    For about two or three weeks would that have been?

18  A.    I believe it was described as a couple weeks.

19  Q.    Couple weeks.

20        And that being the case, that would put it

21  sometime into October?

22  A.    Probably the first part of October.

23  Q.    First part of October.

24        So now Darryl was inside the house.  He's

25  gotten himself inside the house.  It's the first part

1   of October.  And did Faye not tell you that sometime

2   after he had gotten inside the house, a girl or a woman

3   came over and cooked up a small quantity of crack with

4   Faye being there and Darryl being there?  Do you

5   remember that?

6   A.    No, sir, I don't.

7   Q.    Okay.

8             Do you remember Faye telling you that perhaps

9   a few days after that, that another woman, a different

10  woman, came over, and again cooked up a small quantity

11  of crack cocaine with Darryl and Faye being there?

12  A.    I don't remember the part about a woman coming

13  over, but I do recall something about crack being cooked.

14  Again, there was a lot of things discussed, and without

15  looking at my reports, I don't want --

16  Q.    If you want to look at your report, feel free to

17  do so.  It does not matter to me.  The main thing is

18  to have a clear understanding so the Judge can make

19  some appropriate ruling.  So, you know, feel free to

20  look at your report.

21  A.    Now that you say that about someone else, I don't

22  recall the fact about the sex, whether it was a male

23  or female.  I do recall the fact it was being discussed

24  about someone coming into Faye's house.

25  Q.    All right.

1   A.    Other than that, I couldn't tell you who it was

2   or...

3   Q.    And then sometime after that, Darryl cooked up

4   his first batch of crack cocaine?

5   A.    I can't tell you if that was his first batch.

6   Q.    Well, if I represent to you that that is what Faye

7   said, that that was the first time he cooked crack

8   cocaine in her house?

9   A.    Cooked it in her house?

10  Q.    Yes.

11  A.    Then, yes.  I don't know if it was his first batch.

12  Q.    Well, she also indicated that it was her

13  impression that these women were teaching him how to

14  cook crack, or something to that effect.  Do you have

15  any recollection of that?

16  A.    I don't recall that being brought up, no.

17  Q.    So if that is, in fact, the time sequence, and

18  we're now sometime in the middle of October, and now

19  Darryl is starting to cook crack, how often did Faye

20  tell you that, in fact, Darryl was cooking up crack?

21  A.    Again, I'd have to look at the report.

22  Q.    Well, why don't you do that, then?  If that makes

23  it easier -- do you have your report?

24  A.    I need the 302 reflecting that.  I don't have that

25  in front of me.

Sullivan - cross                77

1    Q.    Well, if you want to get it, feel free to do so.

2    And you may leave the stand and get it, if you want.

3    A.    If the Government has the reports...

4              MR. PRETTYMAN:  Your Honor, is it okay if I

5    hand --

6              THE COURT:  That's fine.

7              MR. PRETTYMAN:  This is a batch of the

8    discovery I provided to Mr. Benson that I've just put

9    in front of Detective Sullivan (handing notebook to the

10   witness).  And I'm not saying that that is the report

11   or not that I have the page opened to.

12             THE WITNESS:  No, this is not the report.

13             (Pause.)

14             THE WITNESS:  The one -- the one 302 was

15   the -- the initial meeting with Faye Bullock and her

16   court-appointed attorney.  There was some discussion in

17   that one.  But I don't think it's what -- it reflects

18   what you want -- what's your question?

19   BY MR. BENSON:

20   Q.    My question is, how frequently did Faye tell you

21   that Darryl was cooking up drugs at her residence?

22   Cooking up crack?

23             (Pause.)

24             THE WITNESS:  Okay.  Faye, in the one 302

25   report, dated 12/8/97, Faye Bullock advised that

Sullivan - cross                78

1   Chambers usually will cook three to four times per week.

2   BY MR. BENSON:

3   Q.    Okay.

4   A.    And does all the selling outside her house.

5   Q.    Now, that says three to four times per week.  That

6   does not say three to four nights per week, does it?

7   A.    No.  Three to four.  The report reflects three to

8   four times.

9   Q.    Three to four times per week, not three to four

10  nights per week; is that right?

11  A.    Correct.

12  Q.    Did you question her in depth about that statement?

13  Now, she's saying to you, the night of the arrest, that

14  Wolfie cooks three to four times a week at her house;

15  right?

16        Did you ask for or through your investigation

17  try to pursue that and find out exactly what she meant by

18  all of that?

19  A.    No.

20  Q.    So she's telling you three to four times a week.

21  Did you discuss with her the quantity of the drugs that

22  he was cooking up?

23  A.    If I can refer back here...

24  Q.    Go ahead.

25        (Pause.)

1           THE WITNESS:  I do recall -- and, again,

2    there was no -- there was no weight.  It's just that

3    Faye Bullock had advised during the course of

4    conversation that Wolfie would only cook up a little bit

5    at a time.  What a little bit is?  Again, only your

6    client knows the weights.  I can't tell you what the

7    measurement was.

8    BY MR. BENSON:

9    Q.    So if he cooked three or four times a week and he

10   would only cook up a little bit at a time, what's the

11   logical conclusion to draw from that, detective?

12   A.    I think exactly what you represented here earlier.

13   It would be something like this, like 4 ounces at a

14   shot (indicating).

15   Q.    That is a little bit, in your mind?

16   A.    Out of a key, it is.

17   Q.    So 4 ounces three or four times a week?

18   A.    I --

19   Q.    Do you believe that that very well could be

20   accurate?

21   A.    I can't tell you what the -- the amounts were.

22   Q.    I understand.  The problem -- here's the problem,

23   so you'll understand, which I'm sure you already do.

24           The Judge has to sentence Mr. Chambers

25   based on weight.

1    A.    Mm-hmm.

2    Q.    And the purpose of this two-day hearing is to

3    determine -- try to give the Court an idea of the

4    weight.

5    A.    I understand.

6    Q.    And, you know, Faye Bullock, who you agree is

7    very unintelligent and very unsophisticated, makes a

8    representation, first off, that she does not know how

9    many ounces are in a pound, she doesn't have any idea

10   as to ounces, keys, grams, all of those things.

11              You agree with that?

12   A.    Yes, I do.

13   Q.    Right?

14   A.    Yes.

15   Q.    And then based on discussions she has with you and

16   Agent Cobb, she says, well, 25 keys, 13 powder, 12 crack.

17              Now, she says that, and everybody goes off

18   and that's it.

19              Now the question I'm trying to find out, and

20   the purpose of all of this, is:  How accurate is that

21   statement?  And that's what I'm trying to determine

22   from you.

23   A.    I think I can answer that for you, if you let me.

24   Q.    I would be more than happy to.

25   A.    May I?

1    Q.    Please.

2    A.    Okay.  We agree that Faye and Linette couldn't

3    describe the measurement or the weights accurately.

4    Q.    We also agree that they never were given examples

5    of weight --

6              MR. PRETTYMAN:  Excuse me, your Honor.  The

7    Detective was requested and was permitted by Mr. Benson

8    an opportunity to explain.  And before he even gets the

9    first sentence out, he's interrupted with another

10   question.

11             THE COURT:  That's okay.  I will let the

12   witness and Mr. Benson work out how they want to handle

13   the question and answer.

14             Go ahead, Mr. Benson.

15   BY MR. BENSON:

16   Q.    As I was saying, in addition to the weight, neither

17   one were given the opportunity to hold something to

18   equate that weight with what they either saw, observed,

19   or carried belonging to Mr. Chambers; isn't that

20   correct?

21   A.    They could not describe the weights at all.

22   That's what I'm trying to tell you.  They were describing

23   the size of the package.

24   Q.    I understand.

25             But don't you agree with me, after our

1   discussions, that the size does not in any way

2   necessarily dictate the weight?

3   A.    It does, if you allow me to finish.

4   Q.    Well, didn't we spend 15 minutes -- excuse me,

5   Officer -- indicating just this, with these three

6   examples?  That these three examples certainly are not --

7   you look at the size of those and you would certainly

8   be disillusioned into thinking which one would be the

9   heaviest; isn't that correct?

10  A.    Exactly, but --

11  Q.    Okay.

12  A.    That's not what I was trying --

13  Q.    Go ahead.

14  A.    You asked me a question.  I was trying to give you

15  what my answer is.

16  Q.    Go ahead.

17  A.    I can only -- I said this to you earlier:  I don't

18  know the weights.  I wasn't with Wolfie, none of us were,

19  except for him.  I can't tell you what the weights were.

20  I can only tell you what my training and my experience,

21  with my interviews, I made an opinion.

22          After that opinion, their descriptions of

23  Faye Bullock.  She was -- she would see one and one.

24  One of these in powder, one of these in crack

25  (indicating).  That's a kilo, combined weight.

1      If you look at two boxes of sugar and you

2  look at this (indicating), my experience and training

3  would dictate that that is a kilo.

4  Q.    I understand.  I'm sorry?

5  A.    If I can finish...

6  Q.    Go ahead.

7  A.    Now, Linette Crawford describes and then draws what

8  she remembers as being what she transported and had seen

9  on occasion as being this big peanut and then a little

10 peanut (indicating).

11     My experience and training and what she is

12 describing and what I'm looking at is, in my opinion, a

13 kilo (indicating).

14     After these two interviews and these two

15 descriptors were given by each co-defendant separately.

16 And then, after the interview with your client, I have

17 come to a conclusion that, after his admission of 15 to

18 20 kilos and their descriptions of kilos or half-kilos,

19 one and one, that the girls were accurate in their

20 descriptors and that kilos, not quarter-kilos

21 (indicating), were transported or...

22 Q.    In the meantime, the defendant's exhibit, putting

23 up against the drawing, you've conceded earlier, is

24 consistent, and, in fact, may be bigger than the drawing

25 that Linette testified to yesterday is typical of what

1    she transported; isn't that correct?

2    A.    From someone who does not know weights, this is

3    bigger and looking at this peanut, this is bigger than

4    that smaller peanut.

5    Q.    I understand.  But, Officer, you never gave them

6    the example or the opportunity to hold either a kilo of

7    drugs or a quarter-kilo or a half a kilo or that smaller

8    package that may be two keys; isn't that correct?

9    A.    I never let them hold anything.  They only describe

10   it, one describe it and agree to a size of a box.  One

11   described it and then drew it.

12           After your client gave us the statement

13   that he did 15 or 20, I made a conclusion that those

14   girls were accurate in what they described as kilos.

15   That's my opinion.

16   Q.    Okay.  I understand.

17           Now let's get back to your conversation with

18   Faye.

19           She indicated to you that she saw Wolfie

20   cook crack three times -- three to four times a week;

21   right?

22   A.    Correct.

23   Q.    Now, what does that mean to you?  I mean, when

24   that statement is made, what does that tell you, based

25   on your experience?

1    A.    That he's cooking for supply and demand.  Whatever

2    he needed to sell, that's what he was taking off the

3    block or the brick or the key and cooking it up.

4    Q.    Three to four times a week?

5    A.    Yes, sir.

6    Q.    All right.

7              Did Linette tell you that, in fact, she

8    observed two sales taking place, where he sold crack, I

9    guess a rock, for $50?  Did she tell you that?

10   A.    I don't -- which -- which interview or conversation

11   are you referring to?

12   Q.    She testified to that yesterday, that she observed

13   Darryl sell crack on two occasions in one night, two

14   separate times, where he sold a rock for $50.

15   A.    And this was who?  Linette or Faye?

16   Q.    Linette.

17   A.    I don't recall that.  But if you are saying she

18   testified to that --

19   Q.    What quantity of crack would $50 purchase?

20   A.    It depends.

21   Q.    Actually, she said 50 or 60 dollars.

22   A.    It all depends.

23   Q.    Depends on what?

24   A.    If you knew the subject, the subject was a

25   regular customer -- there's a lot of denominators in

1    there.

2    Q.    Well, typically, based on your street experience,

3    what do you buy for 50 or 60 dollars, as far as crack?

4    Do you get an eight -- what do you call it?

5    A.    An eight-ball is 3-1/2 grams.

6    Q.    So that would be a lot more than -- yes.  So what

7    would you get for $50?

8    A.    A little over a half, maybe.

9    Q.    Okay.

10   A.    Half a gram.

11   Q.    I mean, that's consistent?  Is that --

12   A.    When you're talking drugs in the city, things are

13   consistent and things are inconsistent.  But more

14   consistent than not, it's usually a $50 piece or $50

15   rock or a 50, it could be anywhere from .5 to .8.  It

16   depends if it's being paid.

17   Q.    All right.

18             So, in any event, that is consistent, as

19   far as $50 and all that business; right?

20   A.    For a $50 piece?  Yes.

21   Q.    Now, did Faye tell you that Linette was at her

22   house most evenings?  Did you ask Faye that?

23   A.    I think the way it was described to me and, again,

24   from my memory, is that Faye was over her house a lot.

25   Q.    A lot?  You mean Linette was?

1  A.    Linette was over Faye's house a lot, but Linette

2  could not stand the smell of the crack when it was

3  being cooked and would leave.

4  Q.    Well, the 302 indicates that Linette was over

5  Faye's house on two occasions when crack was being

6  cooked.

7  A.    Okay.

8  Q.    And that the second time or first time -- one or

9  the other time, she left because of the smell.  So she

10  was only there, and she so testified, on two occasions

11  when crack was being cooked.

12  A.    That's fine.  That's fine.

13  Q.    But she also indicated she was there a lot of

14  nights.

15  A.    That's correct.

16  Q.    Which, when no crack was being cooked.  Faye

17  indicates that crack was being cooked three or four

18  times a week.

19  A.    Well, Linette didn't stay there.  It could have

20  been cooked before she got there.

21  Q.    And my question, I guess, rhetorically, is how

22  could it have been cooked before she got there if she

23  brought the drugs?

24          MR. PRETTYMAN:  Your Honor, if it's a

25  rhetorical question, then it shouldn't be asked to a

1    witness.

2                MR. BENSON:  Well, then, I will rephrase

3    it.

4    BY MR. BENSON:

5    Q.    Do you agree that Linette was the one bringing

6    the drugs to Darryl?

7    A.    Yes.

8    Q.    So if Linette is bringing the drugs to Darryl,

9    obviously, he can't cook up drugs before she gets there

10   with the drugs; isn't that correct?

11   A.    That's absolutely correct.

12   Q.    Okay.

13              So now she gets there.  She has the drugs.

14   She spends the night.  He's not cooking drugs.  He wraps

15   up, gives her back the drugs, and she leaves.  We had

16   that discussion a little earlier.

17              No drugs are being cooked that night?

18   A.    Which night?

19   Q.    Any night?  A hypothetical night.  A night where

20   she drops the drugs off, she spends the night, and she

21   spends the night until 9:00 o'clock or so.  They close

22   down and then she leaves with the drugs.

23              She has testified she was only there twice

24   when drugs were being cooked.

25   A.    I understand that part.

1  Q.    And Faye has indicated that Linette was at her

2  house a lot of times.  Faye testified under oath

3  yesterday that she was there probably 90 percent of the

4  time that Darryl was there.

5  A.    Okay.

6  Q.    Okay?

7         So isn't it logical to conclude that if Faye --

8  if Linette is at Faye's house 90 percent of the time, and

9  Faye objects to the crack being cooked, that it's not

10 being cooked when she's there?

11 A.    No.

12 Q.    No?

13 A.    What if Linette stepped outside?  There's too many

14 things you can say here.  I mean, what if I was on the

15 corner?  I mean, what if I was off that day?  There's

16 too many things to throw into the picture.

17 Q.    Exactly.  The point being is that you don't really

18 know?

19 A.    I don't know.  Your client is the only one who

20 knows.

21 Q.    And do you agree Faye doesn't know?

22 A.    Faye knows, but I don't think she can tell you

23 what percentage of the time she was there.  No one knows.

24 Q.    And do you agree that Faye is subject to be, for

25 want of a better word, manipulated?

1    A.    I don't know if I would say manipulated.  I would

2    agree yes and no on that.

3    Q.    Would you agree that she is borderline intelligence

4    and that she's subject to being -- that she's subject to

5    accepting suggestions?  That she really doesn't know?

6    A.    Well, I think both --

7    Q.    Linette and Faye?

8    A.    Yes.

9    Q.    Now, you testified also about the lab report for

10   the items that were seized from Faye Bullock's house,

11   and you indicated that the lab report indicated that

12   there was a print on the digital scale and the Duracell

13   battery; isn't that correct?

14   A.    I know the scale, the battery.

15   Q.    Okay.

16         Well, on the scale, in any event.  And that

17   was Darryl Chambers --

18   A.    It was a latent print compared to the ones I had

19   taken from your client.

20   Q.    Right.

21   A.    And the one obtained off the scale.

22   Q.    Now, the lab report also indicated that everything

23   else that was sent for analysis was, in fact, analyzed,

24   including the weapons; isn't that correct?

25   A.    That is correct.

1  Q.    And isn't it true that the weapons came back

2  without Darryl Chambers' prints on them or having been

3  identified as being on the weapons?

4  A.    You are most certainly correct.

5  Q.    And also on the bullets?

6  A.    The only thing that we received or obtained a print

7  off was the scale.  That's the only thing we're bringing

8  up.

9  Q.    Right.

10        And, in fact, the report comes back that

11  there were no identifiable latent print impressions on

12  the other items?

13  A.    The only print in question here is on the scale

14  is the only thing that matched your client's

15  fingerprints.

16  Q.    Exactly.  There are no other fingerprints found;

17  right?

18  A.    The only identifiable print was on the scale,

19  which matched your client's.

20  Q.    All right.

21        In addition to that, isn't there a statement

22  from Faye Bullock, indicating that she never saw Darryl

23  Chambers possess the drugs or deal with the drugs and

24  have a weapon in his possession at the same time?  Do

25  you remember that?

Sullivan - cross                    92

1   A.    Yes.  She testified at the same time.  That's

2   correct.

3   Q.    Okay.  At the same time?

4   A.    Absolutely.

5   Q.    They both testified, Linette and Faye, that they

6   did see Darryl with a weapon; is that right?

7   A.    Several times, saw him deal several times, but

8   never at the same time.

9   Q.    Exactly.

10  A.    I agree with you a hundred percent.

11  Q.    Okay.  Fine.

12          Now, in a 302 that was prepared, I guess, by

13  you, dated December the 15th, in reference to Linette --

14  I'm sorry.  Linette Crawford.  I asked her yesterday -- I

15  read her this sentence that's in your 302:

16          "Crawford has personally seen at one

17      time what she described as a kilo in that

18      Chambers bag that she would hold for him."

19          She emphatically denied ever saying that.

20  She again re-emphasized that she has no idea what a kilo

21  is and that she would have never said that to you.

22  A.    Okay.  You're saying on the 15th?

23  Q.    Yes.

24  A.    The 302 authored by me?

25  Q.    Well, it has your name here.

Sullivan - cross                    93

1   A.    Okay.  At the second paragraph, third paragraph in?

2   Q.    Second paragraph -- third paragraph, yes.

3   A.    Okay.  And, again, if you look at that, and what

4   I've been saying this whole time that I've been on the

5   stand, and I will read it for you again:

6              "Crawford had personally seen at one

7         time what she described as a kilo."

8              Described.  Kilo is what I determined it to

9   be.  That's my interpretation.

10  Q.    So she gave a description of what she saw?

11  A.    That's what I've been saying the whole time on the

12  stand, Mr. Benson.

13  Q.    So basic -- and the description would have been, I

14  saw a peanut-shaped thing, six or seven inches long, two

15  inches wide at the end, two to three inches wide at the

16  end going down to one inch in the middle and so you put

17  the word kilo with that?

18  A.    I did.

19  Q.    You did?

20  A.    I've been saying that the whole time.

21  Q.    You could have just as easily put quarter-key with

22  that?

23  A.    I think that's what you wanted to put.

24  Q.    No, no.  I want to know the truth.  I don't think

25  you know the truth, nor do I.

1   A.    I can only tell you what my experience and training

2   and their description of the package that they

3   transported was.

4   Q.    Right.  But in the meantime, the description that

5   she gave you is exactly what I just told you and what

6   she drew:  A six- or seven-inch long peanut-shaped item,

7   three inches wide at either end, slimming down to about

8   an inch in the middle?

9   A.    That's correct.

10  Q.    That's correct.

11          You, based on that description, without her

12  saying how much it may have weighed or lifted it up and

13  saying, Gee, it was heavy, it was heavier than this,

14  lighter than that, you know, all those kind of things,

15  you said, Well, based on my experience, that's a kilo;

16  isn't that correct?

17  A.    And what I've been saying, the word prior to that

18  described --

19  Q.    Just yes or no?

20  A.    That's what I believe to be a kilo.

21  Q.    So that description that she gave you is what you

22  described as a kilo?

23  A.    That is an accurate depiction of what I believe to

24  be a kilo:  2.2 pounds.

25  Q.    But Linette never said it was a kilo.  She never

Sullivan - cross                    95

1  said it weighed over two pounds.

2  A.    No.  I never said that.

3  Q.    No.  I never said you did.  There was never any

4  discussion from Linette or Faye as to weight; isn't

5  that correct?

6  A.    We agreed upon that a long time ago.

7  Q.    Okay.

8         Now, you indicate in your 302 that since

9  June/July of '97, Crawford believes that Wolfie has

10 moved at least 25 kilos of cocaine that she is aware of.

11        Now, yesterday she testified that her

12 relationship with Wolfie, as far as -- started around

13 the beginning of August.

14 A.    Okay.

15 Q.    So where did the date June come from or the month

16 June come from?

17 A.    That was from her statement at the time of her

18 interview with her court-appointed attorney.

19 Q.    Okay.

20        Did she, in fact, tell you that her

21 relationship with Wolfie started in August?  Around the

22 beginning of August?

23 A.    Which 302 is that?

24 Q.    This is the same one that we were talking about,

25 actually.

Sullivan - cross                96

1   A.    The back page?

2   Q.    Yes.  It's December the 12th, Page 2.

3              (Pause while the witness reviewed the

4   report.)

5              THE WITNESS:  Okay.  The bottom -- one of

6   the last paragraphs.  It says June/July '97, Crawford

7   believes Wolfie has moved at least 25 kilos of cocaine

8   that she is aware of.

9   BY MR. BENSON:

10  Q.    Yes?

11  A.    Okay?

12  Q.    Yes.

13  A.    And your question is?

14  Q.    Didn't she also tell you or didn't she tell you

15  that her relationship with Wolfie, as far as being a

16  courier or whatever, started in August, about the

17  beginning of August?

18  A.    I know it was summertime and this is an accurate

19  report of what she stated that day, when she first did

20  it.  And I believe, according to Linette Crawford, was

21  that she picked up or she started doing it like full-time

22  after that, which would have been, I guess, maybe in

23  August.

24  Q.    Now, she also believes that there were 12 crack and

25  13 were powder of the 25 kilos.

1          Did you question her about where she made

2    that determination or how she drew that conclusion?

3    A.    Yes.

4    Q.    And did you ask her if it came from her visualizing

5    12 or -- 12 kilos of crack cocaine by seeing it?

6    A.    It was never brought up kilos, again, because it

7    was described as, what, peanuts.  So during the interview,

8    again, we referred to, Well, how many peanuts did you

9    carry?  And she said about 12 powder, about 13 rock.

10   Q.    Now, if I tell you that yesterday she testified

11   under oath that, in fact, she only saw crack on two

12   occasions, one occasion being in August, where she

13   thought -- when I say saw, she had a ball of what she

14   believed was crack cocaine, because Darryl opened it in

15   front of her, and she saw the color of it.

16   A.    Okay.

17   Q.    And believed that that was crack cocaine, but it

18   was a small ball, which -- which she described as being

19   about the size of the end of this peanut (indicating)

20   that the defense -- Defense Exhibit 1.  And that was in

21   August.  And that the only other time that she saw crack

22   cocaine was the time when Darryl sold two rocks to two

23   different people on one night for about $50 each.

24   A.    Okay.

25   Q.    That she got this information, that I guess she

1   relayed to you, from what Faye told her, that Darryl

2   was halving the drugs, and that Faye was complaining to

3   her about he was cooking up all these drugs.

4           Do you remember any of that conversation?

5   A.    Yes, I do, and that is an accurate statement.

6   Q.    That is accurate?

7   A.    That Linette said Faye had told her --

8   Q.    Yes.

9   A.    -- more on the quantity than she actually saw

10  herself.

11  Q.    Okay.

12          So then when you say in your 302 Crawford

13  believes that 12 were crack and 13 were powder, she

14  believes it not because of any first-hand information

15  that she has, she believes it based on what she told you

16  that Faye told her; isn't that correct?

17  A.    That is correct.

18  Q.    So when you questioned Linette, did you, in fact,

19  conclude that Linette, from first-hand information, and

20  first-hand knowledge, and her own personal observation,

21  really didn't know how much, if any, crack was involved

22  with Darryl?

23  A.    The amounts?

24  Q.    Yes.  Amounts.  We know there's crack involved.

25  Nobody is saying otherwise.

1   A.    I can't tell you -- she did not know the exact

2   amounts.  She wasn't privy to that -- from my

3   information from doing the interviews that Faye was.

4   Q.    She didn't know any of the amounts?

5   A.    Just what she -- I believe it was two different

6   occasions that she personally observed.

7   Q.    Exactly.  And they were very small quantities both

8   times, were they not?

9   A.    Again, I think your depiction of one ball was

10  accurate, but she did admit to seeing peanuts in the bag,

11  because she had looked into the bag, but she didn't feel

12  them or weigh them --

13  Q.    Yes.

14  A.    -- she saw a lot of the gray duct tape peanuts.

15  Q.    Yes.  And you cannot conclude from that statement

16  that they were crack as opposed to powder; right?

17  A.    Not from that statement, no.

18  Q.    From any statement that she gave you, from her own

19  personal knowledge?  She never felt it.  She never

20  observed it.  She never saw anything?

21  A.    She had -- she had touched it, I believe, during

22  the one statement that she made, that she did touch one

23  and it was real hard.

24  Q.    Yes.

25  A.    That's the only time that she stated she felt one

Sullivan - cross                    100

1   of the packages.

2   Q.    Right.  And real hard certainly does not in and of

3   itself mean that it was crack.  You just testified

4   earlier about touching the powder, and that was hard,

5   and that was rock-like?

6   A.    Well, in appearance, when you feel it, you can tell

7   the difference.

8   Q.    Well, you can tell the difference.

9            Did you ask Linette if she could tell the

10  difference?

11  A.    I believe I did, and I believe she stated she did

12  not know the difference.

13  Q.    Okay.  Thank you.

14           So she could not tell the difference between

15  crack and powder by the feel of that particular bag?

16  A.    No.  Linette was not a, to my knowledge, was a drug

17  user or had knowledge of --

18  Q.    Right.

19           (Pause.)

20  BY MR. BENSON:

21  Q.    Did you ask Linette how often she spent nights at

22  Faye's house?

23  A.    See, you're confusing me, because when you say stay,

24  do you mean sleep-overs?

25  Q.    No, no, no.  I mean did she spend time?  I thought

1    I corrected myself.  I apologize.

2    A.    That's -- and, again, interpretation comes into

3    play here.  When you say stay, I mean, that could mean

4    going over.  From my experience, when someone stops by,

5    that's open to interpretation.  Your interpretation, my

6    interpretation, everybody in this courtroom.

7    Q.    Well, let me try to be a little bit more specific,

8    if I may.  Let's say we're in October and Faye is at the

9    house.  Darryl is there.  He beeps Linette.  She brings

10   the book bag with the drugs.  They're wrapped.  It's a

11   peanut, whatever that means, and most of those nights

12   would you ask her whether or not she would spend, you

13   know, three or four hours there with Faye and Darryl,

14   hanging out, while Darryl did his thing, or would she

15   leave?

16            Did you question her about that?

17   A.    Mr. Benson, to answer that, no, I did not, because

18   if we go into depth on every question, I'd still be

19   writing.  I'd probably have the Encyclopedia Sullivan.

20   Q.    Does that mean the answer is no?

21   A.    Exactly.  No.

22   Q.    So you don't know how much time she spent there.

23   If she said yesterday she was there a lot of time and if

24   Faye said there she was 90 percent of the time, you have

25   no reason to dispute that?

1  A.    I agree with that.  Both said that they were there

2  together.  But what time were they actually in the house

3  together?  I can't tell you.  I mean, I don't think they

4  were Siamese twins, but --

5  Q.    I understand.  But they spent a lot of time

6  together when Darryl was there?

7  A.    And whether they were both inside the dwelling at

8  the time, I can't tell you.

9  Q.    Well, Linette indicated that she was there a lot

10  of time.

11  A.    Exactly.  They both describe that to us on several

12  times.  I can't tell you what the -- describe a lot of

13  times.  She could have walked in and said, Hey, what's

14  happening?  Here's the stuff.  See you.  I will be out

15  front.

16  Q.    Now, when -- just a couple more questions, Officer.

17         When Faye said to you, Darryl is cooking crack

18  at the house, and she says three or four times a week,

19  what did you think -- what did that mean to you?  Did you

20  think three or four times a week, or did you perhaps

21  misperceive that she was saying three or four nights a

22  week?

23  A.    Mr. Benson, I think I answered this earlier:  Three

24  to four times a week, to me, in the 15 years that I've

25  been doing narcotics investigations, is that it's supply

1    and demand.  When the crack starts to run off, let me

2    cook up another batch and have some ready.  It's all

3    about money.  Everything is about money.

4    Q.    And isn't it typical that typically the crack is

5    cooked up in quantities of three to one?  In other words,

6    three ounces of powder, one ounce of bicarbonate.  You'd

7    cook that up and you'd end up with like three ounces of

8    crack?

9    A.    It all depends on who the cook is.

10   Q.    Well, but generally speaking, isn't that typical

11   formula?

12   A.    No.  There are too many --

13   Q.    No?

14   A.    -- formulas.  You can cook A-1, if you want.  You

15   can do three to one.

16   Q.    Is that A-1, as you put it?

17   A.    Can be.  It depends on who the cook is.

18   Q.    What's the difference?

19   A.    You can cook garbage.

20   Q.    What's garbage?

21   A.    You'll find sodium bicarbonate in the crack.  They

22   don't let the impurities go to the bottom.  As soon as

23   they dump it in, they scoop it out.

24   Q.    And what was determined by the examination of

25   this -- these drugs?

1    A.    No sodium bicarbonate present.

2    Q.    So what does that mean?

3    A.    The cook knew what he was doing, let all the

4    impurities go to the bottom.  You scoop out the cocaine

5    base, which is an oil base, which floats to the top,

6    cook it out, chill it, cool it, dry it out a little bit

7    and then wrap it.

8    Q.    Right.

9              Now, the scale that you referred to, you said

10   that scale is capable of weighing any quantity, isn't it?

11   It's a digital scale?

12   A.    That scale, according to the package, will weigh up

13   to 10 pounds.

14   Q.    Up to 10 pounds.  And it's accurate for ounces, is

15   it not?  Like 4 ounces, 5 ounces?

16   A.    From zero to 10 pounds.

17   Q.    Right.  So I mean if somebody wanted to weigh a

18   quarter-key, which is, I guess, 8 ounces?

19   A.    I will make it even easier for you.  How about a

20   quarter-ounce?

21   Q.    You could weigh a quarter-ounce?

22   A.    You could weigh a 10th of an ounce.  From zero to

23   10 pounds.

24   Q.    So you don't have to presume that it was purchased

25   to weigh large quantities of drugs?  It can weigh any

Sullivan - cross                          105

1   quantity, from zero up to 10 pounds, you say; is that

2   correct?

3   A.    No.

4   Q.    It's not correct?

5   A.    Someone involved in large quantities of drugs buys

6   a large scale.

7   Q.    Why?  I mean why not by a large scale anyway?

8   What's the difference?

9   A.    Money.

10  Q.    Well, how much does that cost, that scale,

11  approximately?

12  A.    I don't know, but it's all about money.  This

13  whole business is about money.

14  Q.    Well, but, you know, that's why some people by

15  Jaguars and some people by Tauruses, I guess, or

16  whatever.

17  A.    You own a Jag.

18  Q.    That may be.  But the point is that this -- the

19  scale here can be used for any quantity.

20  A.    From zero to 10 pounds.

21  Q.    And do you know the cost of these various scales?

22  A.    It's like any other store.  You can go to WalMart,

23  you can go to K-Mart.  You can go to any other store and

24  they'll vary.  It's like watches.  You probably have a

25  different time than I have.

1    Q.    The point is you can't surmise and presume that

2    because this scale weighs up to 10 pounds, that somebody

3    is dealing weight?

4    A.    I can surmise that.

5    Q.    But that's -- that certainly is not an accurate --

6    that can be your opinion, but there's no evidence to

7    support that.

8    A.    That is my opinion.

9    Q.    But there's no evidence to support that because of

10   the size of the scale.

11   A.    Yes, there is.

12   Q.    There is?

13   A.    Yes.

14   Q.    What is it?

15   A.    I've looked up -- again, at the low end of the

16   scale, a minimum of 5,000 people for drugs.

17   Q.    Yes?

18   A.    I've never seen a guy out on the corner clocking or

19   working on the street selling with a 7-Eleven Slurpee

20   scale cut in half with a 10-pound scale on the corner,

21   trying to weigh out a piece.  It doesn't happen.

22   Q.    Of course not.  They may not even have a digital

23   scale; right?

24   A.    A lot of them do.

25   Q.    Right?

1   A.    A lot of them do.  Small time, small scale.  Big

2   time, big scale.

3   Q.    That's your opinion.

4   A.    That's what you asked for.

5   Q.    Yes, that's true.

6         Now, as far as the bowl, again, that bowl,

7   you can cook any quantity up, to I guess you said, 4

8   ounces or something?  What did you say?

9   A.    Four cups or one quart.

10  Q.    Yes.  Any quantity you can cook in that?

11  A.    From zero to one.

12  Q.    Zero to one.  Exactly.

13        There's nothing to indicate by looking at

14  that bowl the typical weight that was cooked down?  Is

15  there like a line around something?  Do you know what

16  I'm saying, how you can do that?

17  A.    It was -- all indications from our interviews was

18  that your client would wash the bowl after -- apparently,

19  he was a very clean cook.

20  Q.    Right.

21  A.    No, there wasn't any rings or --

22  Q.    No ring or anything that could cause you to draw

23  a conclusion?

24  A.    No, sir.

25  Q.    Again, going back to the May 27th statement that

1  you referred to Mr. Chambers, do you have notes?

2  A.    To be quite honest, Mr. Benson, I think I told you

3  this earlier on:  Was that the notebook that I had that

4  day in question, I could not tell you where it went.  I

5  had it.

6  Q.    So, basically, your 302 that you prepared is based

7  on your memory?

8  A.    That's correct.

9  Q.    As opposed to a review of your notes?

10 A.    That's correct.

11 Q.    And, again, all of us being human, it's subject to

12 mistake, a wrong conclusion, et cetera?  I mean, people

13 do make mistakes?

14 A.    I don't think so, because I think we're in agreement

15 on that, that your client admitted they're only doing 4

16 ounces.  And I stand by that.

17 Q.    What do you mean, you stand by that?

18 A.    He told us that day in the U.S. Attorney's witness

19 room that from shortly after Thanksgiving to the time

20 that he was arrested, that he had only cooked about 4

21 ounces of crack.  I'm not arguing with that; that's what

22 he told us.  If you'd like, we can go into the

23 conversation, but I don't know if you want me to.

24 Q.    I don't remember that part.

25         MR. BENSON:  Your Honor, may I just take a

1    moment, please?

2              THE COURT:  All right.

3              (Pause while Mr. Benson and the defendant

4    conferred.)

5              MR. BENSON:  Your Honor, just two points.

6              MR. BENSON:  My client wants me to, again,

7    emphasize, and I need to go back to Detective Sullivan.

8    BY MR. BENSON:

9    Q.    You remember when I questioned you about Linette

10   testifying that on one occasion, she saw a peanut the

11   size of the outer drawing?

12   A.    The bigger peanut.

13   Q.    The bigger peanut.  That every other time, it was

14   the smaller peanut, which is consistent with the Defense

15   Exhibit 1.

16             In looking at your 302 on December the 15th,

17   I asked you -- I'm going to read you this:

18             "Crawford has personally seen that

19         one time what she described as a kilo in

20         that Chambers bag that she would hold

21         for him."

22             Does that -- is that not consistent with what

23   her testimony was yesterday?  That on one occasion, she

24   saw what she believed to be the bigger peanut?

25   A.    That is consistent, and I'm in 100-percent

1    agreement with that.

2    Q.    Okay.

3              The other thing is that you have a clear

4    recollection that Darryl Chambers indicated in the

5    meeting on May the 27th that he started cooking crack

6    in November and not in October?

7    A.    He had told us in the meeting, with you present,

8    that he started cooking right after Thanksgiving, because

9    he needed the extra money.  The young boys did all the

10   other cooking.  I don't know if that would help you out.

11   Q.    Well --

12   A.    He needed the extra money.

13   Q.    I was there, you say?

14   A.    You were present, I was present.

15   Q.    Okay.

16   A.    That was the statement and I stand by it 100

17   percent.

18              MR. BENSON:  Okay.  Nothing further.

19              MR. PRETTYMAN:  Your Honor, I have some

20   redirect.

21              THE COURT:  All right.

22                  REDIRECT EXAMINATION

23   BY MR. PRETTYMAN:

24   Q.    Detective Sullivan, you testified that you were

25   confident in your statements in the report that was

1  written based upon the May interview with the defendant

2  in Mr. Benson's presence; is that correct?

3  A.    That is very correct.

4  Q.    And are you -- do you have any doubts that the

5  defendant told you that on or about Thanksgiving of 1997

6  until his arrest, that he said from his own mouth to

7  your ears that he cooked 4 ounces of cocaine into crack

8  cocaine?

9  A.    That's exactly what he said.  And, again, he did

10 it because he needed the extra money.  He said it's the

11 first time he ever did it.

12 Q.    And are you also as confident that the defendant

13 said to you during that interview that during the

14 approximately six months of the conspiracy, that he

15 possessed with intent to distribute and distributed

16 between 15 and 20 kilos -- kilograms of cocaine

17 hydrochloride?

18 A.    And I have to explain that again, is that we came

19 to that number after we all agreed that there was the

20 good month, the bad month.  The beginning of the month,

21 compared to the end of the month.  It was agreed upon

22 at the end of that interview that 15 to 20 kilos of

23 cocaine was an accurate number.  We all agreed upon that.

24 Q.    What's the date on which you wrote the 302?  Do

25 you still have that?  That 302 of the interview that's

1    marked as an exhibit in front of you?  I think it's

2    Government's Exhibit 18.

3    A.    June 18th.

4    Q.    And did you write that Government's Exhibit 18 when

5    your memory of that interview with the defendant in the

6    presence of his lawyer was fresh in your mind so that

7    it's an accurate report?

8    A.    It was accurate when I wrote it and it's accurate

9    today.  I know that because -- and I think I explained

10   that to you afterwards, is that I felt that that was an

11   inaccurate reflection, and I wanted to terminate the

12   interview.  I remember the entire interview very

13   vividly.

14   Q.    Just to make sure that I understand, the

15   inaccurate reflection was you disagreed with the

16   defendant's crack cocaine statements about it only

17   being 4 ounces of crack cocaine and the interview

18   terminated at that time?

19   A.    That is correct.

20   Q.    Do you still have the Medical Examiner's report?

21           MR. PRETTYMAN:  May I approach the witness

22   again, your Honor?

23           THE COURT:  All right.

24   BY MR. PRETTYMAN:

25   Q.    Do you still have the Medical Examiner's report?

Sullivan - redirect                    113

1    A.    Yes.

2    Q.    Government's Exhibit 10-F?

3              In Government's Exhibit 10-F, does it indicate

4    that the net weight of the substance which a random sample

5    of 50 bags were tested and proved to be crack cocaine,

6    that the net weight of the substance in that sample was

7    30.09 grams of crack cocaine?

8    A.    That's what's reflected on the report, yes.

9    Q.    And is that consistent with the seizure of the

10   crack cocaine that you observed on December 8th, 1997,

11   that was seized in the little bags with the horses on it

12   from the roof overhang that the defendant, Darryl

13   Chambers, was arrested on?

14   A.    Yes.

15              (Pause.)

16   BY MR. PRETTYMAN:

17   Q.    Did Faye Bullock or the defendant -- during that

18   interview on May 27th, on either occasion, were you

19   told by either Faye Bullock or the defendant the

20   defendant had sources of cocaine that would bring the

21   drugs to him?

22   A.    Yes.

23   Q.    And that these would have been sources of cocaine

24   other than the drugs that Linette Crawford would bring

25   back and forth?  It was not Linette Crawford as the

Sullivan - redirect          114

1    source of the cocaine; is that correct?

2    A.    No.

3    Q.    Yesterday, Faye Bullock testified that sometimes

4    the defendant would be cooking the cocaine, the crack

5    cocaine, when she would be upstairs in her room,

6    sleeping or getting ready for bed, I guess, and that she

7    would come down and she would see it.

8              Is that consistent with the statements that

9    you have about she and -- about Linette Crawford not

10   always being present when the crack cocaine was cooked?

11   A.    That's correct.  Present could be like possession

12   I think defined by law.  They could be in the house, but

13   not directly in the kitchen.

14   Q.    Did you or any other law enforcement officers or

15   anyone manipulate Faye Bullock or Linette Crawford in

16   order to give the statements that they gave, describing

17   the cocaine, the crack cocaine, or the stipulations that

18   they reached in terms of the weight of the cocaine and

19   crack cocaine?

20   A.    No, sir, we did not.

21   Q.    You testified that the two firearm exhibits were

22   seized in the same approximate area as the scale, which

23   the fingerprint was found by the ATF fingerprint

24   examiner that matched the defendant's fingerprint; is

25   that correct?

1    A.    Correct.

2    Q.    How far in distance was the gun away from the

3    scale?

4    A.    Right next to it, in the cabinet.

5    Q.    In the same cabinet?

6    A.    Yes, sir.

7    Q.    And what other items were in the same cabinet that

8    could be used to either manufacture, process, bag or

9    weigh crack cocaine?

10    A.    There was a smaller digital scale, which is

11    commonly used for weighing smaller packages.  There's a

12    cutting agent bottle.

13    Q.    By cutting agent, you mean something to dilute the

14    cocaine?

15    A.    Yes.

16    Q.    Okay.

17              And that was all in the same general area?

18    A.    That was all inside the bag.  The only thing outside

19    of the bag that was seized was the large 10-pound scale.

20    Everything else was -- except for the drugs that were in

21    the overhang, was contained inside of the black book bag,

22    which was described and directed as being Wolfie's.

23    Q.    The cocaine hydrochloride that was seized from

24    the ceiling cabinet or the kitchen area of the -- of

25    Faye Bullock's house on December 8th, 1997, by law

1    enforcement officers, how far away was that cocaine from

2    the guns and the scale with the defendant's fingerprint?

3    A.    Right next to it.  The only thing that was away

4    from the scale was the 240 bags of rock substance and

5    two bags of the powder substance, which was in the

6    overhang.  Everything else -- I take that back -- with

7    the exception of the two pagers was found in that

8    cabinet.

9    Q.    Now, Mr. Benson asked you some questions about

10    large scales and small scales and the sizes of bowls.

11    And I want to ask you some followup questions based upon

12    your training and experience about that.

13              In terms of your training and experience,

14    what type of cocaine and crack cocaine distributors use

15    scales that can way weigh up to 10 pounds of cocaine

16    and crack cocaine?

17              MR. BENSON:  Your Honor, I'm going to object.

18    It has already been asked and answered a couple times.

19    I don't see the relevance of this.

20              THE COURT:  Overruled.

21              MR. PRETTYMAN:  Thank you, your Honor.

22              THE WITNESS:  I can only give you one

23    conclusion that I've developed or obtained over the years

24    is that I think I said it best:  Small scales, small-time

25    dealer.  Big scales, big-time dealer.

1    BY MR. PRETTYMAN:

2    Q.    What would a big time cocaine and crack cocaine

3    distributor, why would he need a 10-pound scale as

4    opposed to a little digital scale that would weigh ounces

5    or grams?

6    A.    When you're dealing in pounds.  Again, I've never

7    said this and I stand by this today, is that my conclusion

8    or my opinion was drawn after the interviews with the

9    defendants and that -- or all three defendants.  My

10   opinion is that the weights were kilo weights, which I

11   think the scale supports in that it will weigh up to 10

12   pounds.  You cannot weigh a kilo on that little teeney

13   digital scale.  That is for weighing a smaller package,

14   usually used for street sales.

15   Q.    Grams and maybe --

16   A.    Up to an ounce, a couple ounces.  The size will

17   not allow you to get the whole package on it.

18   Q.    In connection with the bowl, you mentioned that it

19   was four cups or a quart in size.  What does your

20   training and experience tell you about a person using

21   that size of a bowl to cook cocaine into crack cocaine

22   and the type of quantities that will be cooked?

23   A.    That it's used for the cooking or the making of

24   large quantities.  I mean, if you ask me about the

25   quantity, I can give you what my experience and training

1    would dictate, and that would probably be around three,

2    four ounces.

3                    MR. PRETTYMAN:  Thank you.  I have no further

4    questions, your Honor.

5                    THE COURT:  All right.  You may step down.

6                    THE WITNESS:  Thank you, your Honor.

7                    Do you want me to take this evidence off of

8    here?

9                    THE COURT:  You can leave it there.

10                    (Witness excused)

11                         - - -

12                    THE COURT:  Let's talk about scheduling for a

13   minute.

14                    You are resting?

15                    MR. PRETTYMAN:  Yes.

16                    THE COURT:  All right.  I think there was one

17   exhibit that you offered that I reserved decision on

18   based on cross.  I believe there's only one.  Is that

19   consistent with your recollection?

20                    MR. PRETTYMAN:  Yes, your Honor.

21                    THE COURT:  All right.  And do you want to

22   remove the admission of that exhibit?

23                    MR. PRETTYMAN:  Yes, your Honor.

24                    THE COURT:  And I will hear objections.  Do

25   you want to continue to pursue your objection to that?

1              MR. BENSON: I forget what the exhibit is

2 now.

3              THE COURT: All right.

4              DEPUTY CLERK: 10-G and H.

5              THE COURT: 10-G and H?

6              MR. PRETTYMAN: Actually, Judge, I don't

7 think that I am moving 10-H as admission. I marked that

8 more for admission. 10-G is the package that Detective

9 Sullivan made.

10              THE COURT: All right. So I will admit 10-G

11 and 10-H I will take as a demonstrative exhibit; is that

12 correct?

13              MR. PRETTYMAN: Yes, sir.

14              THE COURT: All right. Any objection to that?

15              MR. BENSON: No.

16              THE COURT: Then they're accepted on that

17 basis.

18 ***     (Plaintiff's Exhibit No. 10-G was received

19 into evidence.)

20              THE COURT: You intend to call your client to

21 testify?

22              MR. BENSON: Yes, your Honor.

23              THE COURT: I have a matter scheduled at 12:00

24 and we need to figure out exactly what to do in terms of

25 scheduling, how long you think you'll be. Do you have

1    any estimate for how long you'll be on direct?

2              MR. BENSON:  I wouldn't think -- 45 minutes,

3    maybe.  I'm guessing.  I really don't know, to be honest

4    with you.

5              THE COURT:  Okay.

6              MR. BENSON:  45 minutes.

7              THE COURT:  Do you have anything else planned

8    other than that?

9              MR. BENSON:  No.

10             THE COURT:  All right.

11             Do you have anything else that you intend to

12   do?

13             MR. PRETTYMAN:  Your Honor, it depends on

14   what the testimony would be, whether any rebuttal --

15             THE COURT:  Why don't I take this matter now

16   and we'll plan on coming back.  I have another matter

17   scheduled at 2:00, with people coming in from out of

18   town also.  Let's come back at 1:15, see what we get

19   done; all right?

20             MR. PRETTYMAN:  Yes, your Honor.  Thank you.

21             THE COURT:  Is this other matter now ready?

22   Is the defendant here?  Okay.

23             I will recess the Court from this matter and

24   I will turn to the next matter.

25             (Court recessed at 12:00 noon.)

1

2                          AFTERNOON SESSION

3

4              (Proceedings resumed at 1:25 p.m.)

5

6              THE COURT:  All right.  Ready to proceed.

7         All right?

8              MR. BENSON:  Yes.  Your Honor, are we going

9    to stop at 2:00?  Is that the idea?

10             THE COURT:  Well, my thought is let's head

11   towards 2:00 and then see how much more we've got to do.

12             MR. BENSON:  All right.

13             THE COURT:  Whether I'm going to ask the

14   people to wait at 2:00 or whether we'll start again

15   tomorrow.  It depends a little bit how much we can get

16   done.

17             MR. BENSON:  I call Mr. Chambers.

18             THE COURT:  All right.

19                         - - -

20

21

22

23

24

25

Chambers - direct                    122

1

2                         DEFENDANT'S TESTIMONY

3                              CONTINUED

4

5                    ... DARRYL CHAMBERS, having been

6              duly sworn as a witness, was examined

7              and testified as follows...

8              THE COURT:  All right.  Ready to proceed.

9                         DIRECT EXAMINATION

10   BY MR. BENSON:

11   Q.    Darryl, do you want to state your full name and

12   birth date, please?

13   A.    My name is Darryl L. Chambers.  My birth date is

14   2/3/69.

15   Q.    Okay.

16              You have a nickname also people know you as?

17   A.    Oh.  Yes.  Some people call me Wolfie.

18   Q.    Wolfie?

19   A.    Yes.

20   Q.    Okay.

21              What is your educational background, Darryl?

22   A.    Well, I just completed my last requirement for a

23   B.A. in sociology.  I obtained it from the University of

24   California at Davis.

25   Q.    What campus?

1    A.    University of California at Davis.

2    Q.    Davis?

3    A.    Yes.

4    Q.    Okay.

5          And so you've got a B.A. in --

6    A.    Sociology.

7    Q.    Sociology.

8          And since the date of the arrest, December

9    the 8th of '97, you've been incarcerated?

10   A.    Yes.

11   Q.    At Fairton?

12   A.    Numerous -- numerous county jails, along with

13   Fairton.

14   Q.    Okay.

15          Let's talk about the arrest and this incident.

16   And specifically your relationship with, first, Linette

17   Chambers (sic).

18   A.    Crawford.

19   Q.    Crawford.  Excuse me.

20          Tell me about when you met Linette.

21   A.    I met Linette about 1990.

22   Q.    Okay.

23          And you've known her since 1990?

24   A.    Yes.

25   Q.    Did you know her in a social way?

1   A.    Well, she was dating a friend of mine.

2   Q.    Okay.

3   A.    And that's how her and me became close.

4   Q.    Okay.

5           At some point in the summer of 1997, you and

6   she developed a business relationship; is that not

7   correct?

8   A.    Yes.  Well, we had a -- we met July -- late July.

9   And it was when Delaware had the Joint Task Force

10  investigation with the State and the City combined.

11  Q.    That was July of '97?

12  A.    Yes.  Late July of '97.  And what happened after

13  that was that she brought the drugs back because I

14  believe it was heavy in the area.

15  Q.    Let's stop for a moment.  In July of '97.

16          Prior to July of '97, were you in school

17  full-time?

18  A.    Yes.

19  Q.    Where?

20  A.    University of California, Davis.

21  Q.    And how long had you been at that school?

22  A.    I was there for two years.

23  Q.    And when you say full-time, or when I say full-time,

24  what does that mean, exactly?

25  A.    That means I was carrying a full course load.

Chambers - direct                              125

1    Q.    Were you living in California?

2    A.    Yes.  I --

3    Q.    Were you coming back to Delaware at all?

4    A.    Only during the summer months, the vacation months.

5    Q.    Okay.

6          How about Christmas and Thanksgiving and all

7    of that?

8    A.    I would miss, I think, every -- I missed the first

9    Christmas at home, because I was playing.

10   Q.    Playing what?

11   A.    I was playing basketball.

12   Q.    Okay.

13   A.    The next year I was a coach and the head coach

14   allowed me to come home.

15   Q.    Okay.

16         And that would have been in December of '96?

17   A.    Yes, to '97.

18   Q.    Okay.

19         And before you went to California at Davis

20   campus, were you in college somewhere else?

21   A.    Yes.

22   Q.    Where was that?

23   A.    Armstrong State.

24   Q.    And where is that?

25   A.    That's in Savannah, Georgia.

1    Q.    And were you there as a full-time student?

2    A.    Yes.

3    Q.    Did you live there?

4    A.    Yes.

5    Q.    Other than the summer months?

6    A.    Yes.

7    Q.    Now, in the summer months, you came back to

8    Delaware?

9    A.    Yes.

10   Q.    Did you work in the summer?

11   A.    I did a lot of volunteer work at several youth

12   centers down in Kingswood along with Mark Sills.  He

13   always had me chaperoning kids to numerous events

14   throughout the State.  But the majority of the time I

15   spent with the Sonny Hill camp that summer, I believe.

16   Q.    Now, what summer is this?  '96?

17   A.    This is the summer of -- the summer that I came

18   home from Savannah.

19   Q.    So that was '95?

20   A.    Yes.  And Sonny Hill is a guy who run the

21   professional basketball league up at Temple University,

22   McGonigle Hall, and he had a little summer league where

23   he wanted someone who had made positive strides in the

24   community to get the kids together and act as a mentor

25   to and a coach to these children during the summer.

1    Q.    And you did all of that?

2    A.    Yes.

3    Q.    So you were at school in California and in Georgia

4    for the preceding four years before the summer of '97?

5    A.    In -- yeah.  California, two years.

6    Q.    And --

7    A.    Georgia, then California preceding Georgia.

8    Q.    So California, Georgia, then back to California?

9    A.    Yes.

10   Q.    And the total of four years?

11   A.    Five.

12   Q.    Five years?  Okay.

13              So now we're in the summer of '97.  Are you

14   working the summer of '97?

15   A.    Yes.

16   Q.    Doing what?

17   A.    I'm a tennis instructor for the Wilmington Youth

18   Tennis Council, I believe the name of it is.

19   Q.    Were you getting paid for that?

20   A.    Yes.

21   Q.    How much?

22   A.    I was getting paid $9 an hour.

23   Q.    Okay.

24              Now, at some time in July, you reacquaint

25   yourself with Linette Crawford; is that right?

Chambers - direct                          128

1   A.     That's true.

2   Q.     And you talked about the Task Force, the Joint

3   Task Force, so there was some -- obviously, you started

4   dealing drugs; is that right?

5   A.     That's correct.

6   Q.     You were dealing drugs in July of '97?  You admit

7   that, do you not?

8   A.     Yes.

9   Q.     All right.

10          Will you tell the Judge, please, the --

11  approximately the first time you met Linette and how

12  you two established this relationship?

13  A.     You're talking about when this conspiracy that

14  we're involved in?  Or when I first met her?

15  Q.     July of '97.

16  A.     Oh, I met her, it was late July.

17  Q.     Late July of '97.

18  A.     Police was heavy in the area and I asked Miss

19  Crawford, could she please take this package home for me

20  and bring it back later.  And she did.

21  Q.     She knew it was drugs, presumably?

22  A.     Presumably, it was drugs.

23  Q.     Did you tell her it was drugs?

24  A.     I never told her it was drugs.

25  Q.     But it was safe to presume that?

1   A.    Yes.

2   Q.    What was the quantity you're talking about?

3   A.    About a quarter-key.

4   Q.    Was it powder or crack?

5   A.    Powder.

6   Q.    So she took it home and she brought it back?

7   A.    Yes.  She brought it back that evening.  I said you

8   and me really talk, I'm saying, because I'm in a safe

9   situation, since I knew her so long and I thought I could

10  trust her a little.  I said we need to talk about

11  something.  We went on about playing tag about me talking

12  to her and finally in August I got a chance to talk to

13  her.  And she agreed to hold it and she didn't specify

14  an amount that she wanted.

15  Q.    As far as pay for doing this?

16  A.    Yes.

17  Q.    For helping you?

18  A.    What she said was that the only bill I have to pay

19  in my house is my phone bill.  My uncle calls his

20  girlfriend in Chester and other than my boyfriend calling

21  home from being incarcerated, the only bills you have to

22  pay.

23  Q.    And if he calls home from Gander Hill, it's a

24  collect call?

25  A.    I don't know.  I don't know where --

1   Q.   Well, from prison, it's always a collect call,

2   isn't it?

3   A.   Yes.

4   Q.   So she wanted you to pay her phone bill?

5   A.   Yes.

6   Q.   And you agreed to do that?

7   A.   Yes.

8   Q.   And that started in August or September?

9   A.   That started in August.

10  Q.   Paying the phone bill?

11  A.   Yes.

12  Q.   How often would you see Linette in August?

13  A.   Oh, I would see her most every day.

14  Q.   And would you give her drugs every day to hold?

15  A.   No.

16  Q.   Okay.

17       How often in August would you give her drugs

18  to hold for you?

19  A.   I would give her drugs to hold maybe like four or

20  five times at first.

21  Q.   Now, what does that mean, four or five times? ?

22  In a week, in a month?

23  A.   No.  In a week.  In a week.

24  Q.   Okay.

25       Would you explain to the Judge exactly how

1    this all worked?

2    A.    What I would do is that I would first get a package

3    of cocaine and I would break it down into four separate

4    intervals.

5    Q.    Okay.

6    A.    Not intervals.  Well, pieces.

7    Q.    Explain.  You've got to deal in numbers here.  A

8    package of cocaine, you're talking about a key of

9    cocaine?

10   A.    Yes.

11   Q.    And this is powder?

12   A.    Yes.

13   Q.    And then you would break it down into quarter-keys?

14   A.    Yes.

15   Q.    And you would wrap it?

16   A.    Yes.

17   Q.    And the masking tape or the duct tape that we're

18   all talking about here, the gray duct tape?

19   A.    And then I would go over to Nettie's house and me

20   and her would sit down.  I would tell her, put these

21   three up and I'm going to carry this one with me.

22   Q.    Okay.

23   A.    And then --

24   Q.    When did this start?

25   A.    This started around early August.

1    Q.    Okay.

2    A.    Early August.

3    Q.    So you would bring over four quarter-keys?

4    A.    Yes.

5    Q.    Of powder cocaine, leave it at Linette's house, and

6    then you would take one of the -- you would take a quarter

7    with you?

8    A.    That's correct.

9    Q.    Okay.

10           And then what would happen?

11   A.    After that, I --

12   Q.    Would you sell it?

13   A.    Well, I would proceed to sell some and then what I

14   didn't have -- what I didn't sell, I would wrap up.

15   Either she would come and get it or I would take it to

16   her.

17   Q.    Okay.

18           And then this would happen every day?

19   A.    Every day, except Sunday.

20   Q.    Accept Sunday?

21           And how long would it take you to sell the

22   four quarter-keys?

23   A.    About a month.

24   Q.    So the whole month of August it took you?  You used

25   the whole month of August?

1    A.    How long would it take me to sell four quarter-keys?

2    Q.    A key, basically.

3    A.    Oh, a key?  It took me about a week to sell a key.

4    Q.    A week to sell one key?

5    A.    Yes.

6    Q.    So in the month of August, you sold four keys of

7    powder cocaine is what you are saying?

8    A.    Yes.

9    Q.    Okay.

10          And so --

11   A.    Approximately three.  Approximately four.  It could

12   have been three.

13   Q.    Okay.

14          Three or four keys of powder cocaine you're

15   admitting to selling in August?

16   A.    Yes.

17   Q.    Now, in August, was there any crack cocaine that

18   you had possession of or that you sold?

19   A.    No.

20   Q.    Linette, I believe, testified -- and I may be

21   mistaken here -- that in August she saw a ball --

22   actually, that may have been September.  Did she see

23   any crack cocaine or did you possess any crack cocaine

24   or give her any crack cocaine to hold for you in

25   August of '97?

Chambers - direct                                    134

1    A.    No.

2    Q.    Okay.

3             Now, at some point, you meet Faye Bullock?

4    A.    Yes.

5    Q.    And when did that happen?

6    A.    During this conspiracy or when the first time I

7    ever met her?

8    Q.    Well, first time.

9    A.    First time I ever met her, I was coming home from

10   Georgia -- no, California, my second year, and I had

11   some basketball gear for one of the guys.  And one of

12   the guys was friends with her boyfriend, and that's the

13   first time I met her.

14   Q.    So that's a couple years ago?

15   A.    Yes.

16   Q.    Now, at some point you see her in -- sometime in

17   August or September of '97; is that right?

18   A.    Yes.

19   Q.    And she attempts to borrow money from you?

20   A.    Well, she has someone else to do it.

21   Q.    Why don't you tell the Judge what happens?

22   A.    This girl walks up to me, a friend of hers, and

23   says, My friend want to know, can she borrow some money,

24   because she's got to pay her phone bill, or electric --

25   security bill.  I think it was an ADT bill.  She said,

1    can you loan it to her?  She said she'll pay you back.

2              And I said no.

3    Q.    Does she tell you who it was?  Did she say it was

4    Faye?

5    A.    Did she say it was Faye?

6    Q.    Yes.  Did she tell you who wanted to borrow the

7    money?

8    A.    Yes.  She said Faye wanted to borrow the money.

9    Q.    You said this girl.

10   A.    At first she said my friend and then later on she

11   said Faye.

12   Q.    You refused to loan it to her?

13   A.    I said no.

14   Q.    Go ahead.

15   A.    After that right there, the next day I see her.

16   Q.    See who?

17   A.    I see Faye.

18   Q.    Okay.

19   A.    So I give Faye the money, but in exchange I said I

20   want to just stand on your back step and sell drugs.  I'm

21   not going to bring no drugs into your house.

22   Q.    What did she say to that?

23   A.    She said it's okay.

24   Q.    So at some point you started doing that?

25   A.    Yes.

1  Q.    When was that?

2  A.    Maybe -- well, I gave her the money that day.

3  Q.    What day was that, approximately?

4  A.    Sometime around 7th to the 10th of September.

5  Q.    Okay.

6           And when did you start going to her house

7  and selling off her back porch?

8  A.    About three days later.

9  Q.    So somewhere between the 10th and 13th of

10  September?

11  A.    Yes.

12  Q.    Around the middle of September?

13  A.    Yes.

14  Q.    And how were the drugs gotten to you or how did you

15  end up getting the drugs when you were dealing at Faye's

16  house from her porch?

17  A.    Well, me and Linette would have prearranged drop-off

18  spots and times.

19  Q.    All right.

20  A.    So sometimes I will pick the drugs up on Jensen

21  Drive.  I would pick the drugs up on Claymont Street or

22  I will go to her house.

23  Q.    Her house, meaning Linette's house?

24  A.    Linette's house.

25  Q.    All right.

1    A.    Or Linette would drop them off at the football

2    game or she might be at the liquor store.

3              There's a number of places where I would drop

4    and pick off stuff.

5    Q.    And what was the quantity that Linette would drop

6    off to you?

7    A.    Quarter-keys.

8    Q.    Always quarter-keys?

9    A.    Quarter-keys.  If I had like, maybe like two ounces

10   left over from the previous night, I will bring that, too.

11   Q.    Now, would -- when you say quarter-keys, would it

12   be like in a particular night, if you had two or three

13   ounces left over from the night before, she would bring

14   one quarter-key plus the leftover?

15   A.    Yes.  I would instruct her to bring the little

16   package and bring one of the peanut-shaped items.

17   Q.    Okay.

18              And that was the quarter-key?

19   A.    Yes.

20   Q.    Did she ever bring you more than a quarter-key at

21   any particular time?  I mean wrapped in a peanut-shaped

22   thing?

23   A.    No.  No, not shaped like a peanut.

24   Q.    Was it wrapped in any other way?

25   A.    No.

1    Q.    So the most she ever brought you was a quarter-key

2    at one time plus the leftover from the night before?

3    A.    Yes.

4    Q.    Now, how long did you cook off -- I'm sorry.  How

5    long did you sell off of the back steps of Faye's house?

6    A.    All the way up to December the 8th.

7    Q.    Well, I guess that -- before -- let me rephrase

8    that.

9          You were not going in Faye's house for a

10   period of time?

11   A.    Correct.

12   Q.    And that's the time that you started selling at

13   Faye's house was around the 10th to the 13th of

14   September?

15   A.    Yes.

16   Q.    For what period of time did you not go into Faye's

17   house that you were selling off the back?

18   A.    Three weeks.

19   Q.    About three weeks?

20   A.    Yes.  Three weeks.

21   Q.    Are you sure of that?

22   A.    At least three weeks.  Yes.  I'm sure of that.

23   Q.    What makes you so sure?

24   A.    Because my son had a birthday party on the 27th of

25   September.

1    Q.    Okay.

2    A.    And I remember I was still trying to gain Faye's

3    trust.  So I invited the kids over to the party.  And --

4    Q.    You invited her kids over?

5    A.    Yes.

6    Q.    And at that point -- as of September the 27th, you

7    were not going into her house?

8    A.    That's correct.

9    Q.    Okay.

10          You mentioned you have a son.  How old is

11   that son?

12   A.    He's six.  He'll be seven September the 23rd.

13   Q.    Okay.

14          So on September the 23rd, is it?

15   A.    27th, because his birthday --

16   Q.    September 27th?

17   A.    Yes.  We had a party on that Saturday.

18   Q.    His birthday is the 23rd, but the party is the 27th?

19   A.    Yes.

20   Q.    And you invited Faye's children?

21   A.    Yes.

22   Q.    Where is the party?

23   A.    In back of Nicole's home.

24   Q.    Your girlfriend?

25   A.    Yes.

Chambers - direct                          140

1  Q.    What was that address?

2  A.    1308 East 28th Street.

3  Q.    That's where you were staying?

4  A.    That's where I was living periodically, with my

5  mother.

6  Q.    You were living with your mother, you had a son

7  with Nicole and Nicole and your son lived at that address

8  and you would stay there periodically?

9  A.    Yes.

10 Q.    So as of September 27th, you had still not gained

11 access to Faye's house?

12 A.    No.

13 Q.    Now, the drugs that Linette was delivering to you

14 in September, were any of those drugs crack cocaine?

15 A.    No.

16 Q.    Did you ever have any crack cocaine that you were

17 selling, other than the crack that you have admitted and

18 will admit today under oath to cooking at Faye's house?

19 A.    No.

20 Q.    Never?

21 A.    No.

22 Q.    Never sold crack cocaine, other than the crack that

23 you cooked up at Faye's house, starting at some future

24 point; is that right?

25 A.    That's correct.

Chambers - direct                                   141

1   Q.    That's your testimony under oath?

2   A.    That's my testimony.

3   Q.    Okay.

4         Now we're into -- well, let me rephrase it.

5         After the party on September the 27th, how

6   long after that date did you gain access to Faye's house?

7   A.    I gained access to her house about two weeks after

8   that.

9   Q.    So sometime in the -- in the first week or

10  thereabouts of October?

11  A.    Because what happened was the police had came.  And

12  when the police came, I said -- I got kind of scared

13  because they got close that time to me.  So I asked her,

14  I said, When the police come, let's make the agreement

15  that when the police come, I will come in there.  I will

16  still leave the drugs outside.  She said okay.

17  Q.    Okay.

18        And so when did the police come the first

19  time, that you can remember?

20  A.    Around about the 10th.

21  Q.    Of September?  I mean October?

22  A.    October.

23  Q.    And you went into the house?

24  A.    Yes.

25  Q.    Now, before that, were you -- did you have access

Chambers - direct                                142

1   to the house for purposes of using the phone?

2   A.    Oh, yes.  I'm saying she let me use the phone, but

3   you couldn't bring no drugs in there.  I could stand

4   there -- once I hung up the phone, it was like, out the

5   house.

6   Q.    So starting around the 7th to the 10th of October,

7   she allowed you to come into the house when the police

8   were around?

9   A.    Yes.

10  Q.    At some point she allowed you to come in the house

11  on a regular basis?

12  A.    See, what happened was that maybe a week later,

13  when I went in the house again, because the police came,

14  someone had stole the drugs that I had planted in the

15  trash.

16  Q.    Someone stole them?

17  A.    So I told her, let me stash them in here, because

18  I can't risk losing nine ounces like that.

19  Q.    Okay.

20  A.    So she agreed to that as long as I didn't have any

21  company.

22  Q.    Have any company?

23  A.    Yeah.

24  Q.    So any customers?

25  A.    Yes.

1    Q.    Or whatever?  Okay.

2             So when would you say you started being in

3    the house on a regular basis?

4    A.    Near the middle of October.

5    Q.    Okay.

6             Now, at some point after you gained access to

7    the house, a woman came over, according to what Faye's

8    testimony was, and cooked up a batch of crack cocaine?

9    A.    Yes.  See what happened was that Faye gave me a

10   key.

11   Q.    All right.

12   A.    Faye gave me a key because I said that sometimes I

13   would like to get in there early, because Faye was -- had

14   to go get her kid and she was getting home kind of late.

15   Q.    What does late mean?

16   A.    Around 7:00.

17   Q.    Okay.

18   A.    So I was trying to get there kind of early, around

19   6:00, as soon as nightfall.

20            So one day when she came home, she came about

21   6:15.  She caught the lady in there showing me how to

22   process cooking hydrochloric acid I believe is the

23   specific name --

24   Q.    Right.

25   A.    -- into crack cocaine.

```
 1   Q.    And do you remember what that date might have
 2   been?
 3   A.    That was near the -- near the end of October.
 4   Q.    All right.
 5              Now, so you're talking about like the third
 6   week or thereabouts of October?
 7   A.    Yes, third week.
 8   Q.    And what was the quantity that this woman was
 9   cooking up?
10   A.    It was an eight-ball, because I was just
11   experimenting.  I didn't want to, you know --
12   Q.    What is an eight-ball?
13   A.    3.5 grams.
14   Q.    And this was the first time that you had cooked
15   crack --
16   A.    Yes.
17   Q.    -- in Faye's house?  Or that crack had been cooked
18   in Faye's house with you being there?
19   A.    Yes.
20   Q.    That you're aware of?
21   A.    Yes.
22   Q.    Then it happened again, a couple days after that?
23   A.    Yes.
24   Q.    What happened to those drugs, by the way, that that
25   first lady cooked up?
```

Chambers - direct                                           145

1   A.    I bagged them up and sold them as dimes.

2   Q.    Okay.

3          And how much did you receive as a result of

4   that sale?

5   A.    Out of those sales, you can usually bag up between --

6   if I'm not mistaken, you might be able to bag up like 20

7   dimes.

8   Q.    Okay.

9          So that's $200?

10  A.    $200, give-and-take a couple, so you might make 150.

11  Q.    All right.

12         Now, there was a second time that the drugs --

13  that powdered cocaine was cooked into crack; is that

14  right?

15  A.    Yes.

16  Q.    By a woman?

17  A.    Yes.

18  Q.    And that was a different woman?

19  A.    Yes.

20  Q.    And how long after the first woman did the second

21  woman do this?

22  A.    About five days.

23  Q.    Okay.

24         So that would have put it in the latter part

25  of October again?

1    A.    Yes.

2    Q.    And what was the quantity of those drugs that were

3    cooked up?

4    A.    It was another eight-ball.

5    Q.    Another eight-ball?  Okay.

6          Was Faye there when that happened?

7    A.    See, I always try to use discretion.  I try not to

8    do it while they're there.

9    Q.    Okay.

10    A.    See, but Faye walked in on me again.  She caught

11    me again doing it.

12    Q.    Right.

13    A.    Because I always try to be real, real discreet

14    about certain things around the young ladies and she

15    just so happened to catch me again.

16    Q.    So she saw that?

17    A.    Yes.  She didn't actually -- she knew something

18    was being cooked, because when she come in, she looks

19    and she keeps right on moving.

20    Q.    Right.

21    A.    She don't really like ask a lot of questions.

22    Q.    And they were the first two times that crack

23    cocaine was cooked with you being present in Faye's

24    house?

25    A.    Yes.

1    Q.    Did you cook it any other time during that period

2    where Faye didn't catch you?

3    A.    No.

4    Q.    It just so happened --

5    A.    Every time I cooked, she caught me.

6    Q.    Right.

7    A.    I wasn't supposed to have been doing it.

8    Q.    Right.

9              Now, at some point after those first two

10   times, you started cooking crack cocaine yourself?

11   A.    Yes.

12   Q.    Now, in order to cook the crack cocaine, you

13   learned what you had to do?

14   A.    Yes.

15   Q.    What did you go out and buy and where did you buy

16   it and what quantity?

17   A.    Well, first, I bought a little Pyrex.  It is -- I

18   think it might be 16 -- 16-ounce Pyrex they sell.  It

19   costs $5 up at the store up on Miller Road.  I forgot

20   the name of the shop.

21   Q.    Okay.

22   A.    But I bought one of those first, because you don't

23   need -- you don't need nothing real, real big to cook the

24   little quarters that I was cooking at the time.

25              So when I bought it, I cooked, like, two

1   quarters for like the previous week, two times a week I

2   cooked a quarter each time.

3   Q.    And what's a quarter?

4   A.    7 grams.

5   Q.    7 grams you cooked?

6   A.    Yes.

7   Q.    And so if you cook 7 grams, you cook that at one

8   seating, one session?

9   A.    Yes.

10  Q.    And how much bicarbonate of soda would you put into

11  7 grams?

12  A.    I usually put 7 on 7.

13  Q.    So you put 7 grams?

14  A.    Well, I put one on one.  So if I cooked 3.5, I put

15  3.5.  If I cook 14 grams, I put 14 grams of sodium

16  bicarbonate or baking soda.

17  Q.    Well, you have been here for this hearing for two

18  days?

19  A.    Yes.

20  Q.    And you heard the officer -- an agent testify, I

21  believe, that it's three to one, three grams of powder --

22  A.    Yes, but he was an expert.  So he would know better

23  the ratio to do than I do.

24  Q.    But you're saying that the ratio that you used was

25  one to one?

1    A.    Yes.

2    Q.    So if you put three grams of cocaine and you're

3    cooking a powder into crack, you would put three grams

4    of bicarbonate, sodium bicarbonate?

5    A.    Yes.

6    Q.    And so you then -- you start out with 6 grams.

7    And what would you end up with?

8    A.    It depends on, like, the -- expert said the purity

9    of the cocaine.

10   Q.    And if yours is real pure?

11   A.    If it's real pure, it might come back to the whole

12   3.5.

13   Q.    It would come back to the same thing?

14   A.    Majority of the time, in Delaware it's going to come

15   to 2.73.

16   Q.    So you are saying it would be less weight?

17   A.    Yes.  It's definitely going to come up less.

18   Q.    If you are cooking up 7 grams of powder and you're

19   putting 7 grams of bicarbonate of soda --

20   A.    You're going to get 6 grams, on average.

21   Q.    Of crack?

22   A.    Yes.

23   Q.    All right.

24         How many times -- what was the quantity that

25   you typically would cook up?

Chambers - direct                          150

1   A.    Well, like I said, I first started with eight-balls,

2   because --

3   Q.    Well, that's the two girls?

4   A.    Yes, for the two girls, because I was -- I was --

5   all I sold was powdered cocaine.  So, like Officer

6   Sullivan said, supply and demand.  Everybody was selling

7   crack, so I sold the powder.  So since I sold the powder,

8   I had the powder market virtually locked.  So I had no

9   need to sell crack.

10          But then as things developed and I seen that

11  it was more profit being made in it, I tried to test the

12  market.

13  Q.    In crack?

14  A.    Yes.

15  Q.    When did you start cooking the crack yourself?

16  A.    Like I said, near the third week of October.

17  Q.    You started cooking?

18  A.    Yes.

19  Q.    You, personally?

20  A.    Yes.

21  Q.    Okay.

22          And was -- was Faye present when you cooked

23  this crack up?

24  A.    Like I say, she came -- do you want the first two

25  times?

1  Q.    No.  I'm talking about after that.  When you

2  personally started?

3  A.    No.  I didn't ever believe she was in the kitchen.

4  She might be in the dining room, but not in the kitchen.

5  Q.    When did you personally start cooking up crack?

6  A.    In late October.

7  Q.    You personally started in late October?

8  A.    Yes.

9  Q.    Okay.

10         And how often would you cook the crack?

11  A.    I would cook crack -- well, I first cooked a

12  quarter after the two incidents with the lady.

13  Q.    Right.

14  A.    I cooked a quarter, right, and then I cooked

15  another quarter this week.

16  Q.    Would this have been the third or fourth week in

17  October you're talking about?

18  A.    No.  Now we're at the dead end of -- we're at the

19  dead end of October.

20  Q.    Okay.

21  A.    Going into --

22  Q.    November?

23  A.    -- November.

24  Q.    Okay.

25         So the last week of October, beginning of

1    November, you -- that's when you cooked, on two

2    occasions?

3    A.    Yes.

4    Q.    And what was the quantity, if you can remember?

5    A.    They were quarters.

6    Q.    They were quarter-keys?

7    A.    No.   Quarter-ounces.

8    Q.    Oh, quarter-ounces?

9    A.    Yes.

10   Q.    Okay.

11          They were quarter-ounces?

12   A.    Yes.

13   Q.    So now how many -- now, what is a quarter-ounce?

14   A.    That's 7 grams.

15   Q.    Okay.

16          7 grams.   So you cooked 7 grams and you put 7

17   grams of sodium bicarbonate or bicarbonate of soda and

18   that cooks out to about 6 grams of crack?

19   A.    Yes.

20   Q.    You sell that.   What do you sell 6 grams of crack

21   for?

22   A.    You might make about 300.

23   Q.    Okay.

24          And you did this on two occasions in late

25   October, November.

1              Then, when was the next time you cooked?

2    A.    Maybe about a week later.

3    Q.    Okay.

4    A.    Because now people started noticing I had it, so I

5    started cooking up bigger quantities.

6    Q.    Now, you mentioned you started out with a small

7    Pyrex --

8    A.    Yes.

9    Q.    -- cooking bowl?

10   A.    Yes.

11   Q.    Eventually, you got a bigger bowl?

12   A.    Yes.  Then I got the bowl that the Government

13   seized.

14   Q.    Right.

15   A.    And when -- so now the half-ounces can't fit into

16   the little mixing bowl, because now it spills over when

17   you put the water on.

18   Q.    Okay.

19              Now, half-ounce is how many grams?

20   A.    14.

21   Q.    Okay.

22              So you were cooking 7 grams.  Now you move up

23   to 14 grams?

24   A.    Yes.

25   Q.    You've got 14 grams of powder and you put 14 grams

1    of --

2    A.    Sodium bicarbonate.

3    Q.    With the water.  And it cooks down to what weight?

4    A.    12, 13.

5    Q.    12 or 13 grams?

6    A.    Grams.

7    Q.    And you sell that?

8    A.    Yes.

9    Q.    Along with the powder you're selling?

10   A.    Yes.

11   Q.    Now, when -- explain what's going on in Faye

12   Bullock's house in November, while you're doing all of

13   this?  Who's present?  Explain to the Judge how the

14   system worked, as far as Linette, Faye, et cetera.

15   A.    You're talking about the delivery?

16   Q.    Everything.

17   A.    Okay.

18              So now we eventually got our routine down pat.

19   I call -- I call Miss Crawford.

20   Q.    Now, you say you call her.  How do you call her?

21   By phone, beeper?

22   A.    Sometimes I page her, she page me back.  Sometimes

23   I call her directly from the phone, and I tell her, Meet

24   me at a certain place, or meet me down Miss Bullock's

25   home.

1   Q.    This is November?

2   A.    Yes.  This is November.

3   Q.    Go ahead.

4   A.    Some nights -- some days we'll just sit in there

5   and talk and I wouldn't sell no drugs at all.

6   Q.    All right.

7   A.    We'll just sit in there and talk all day long and

8   gossiping.  I will be eating beers and pizza.  I buy

9   pizza for the kids.

10  Q.    You're talking nights?

11  A.    I say day, but it's nights because I only come out

12  in the evening.

13  Q.    Some nights Faye and Linette would sit around with

14  you and eat pizza and beer.

15  A.    Yes.  Sometimes I would buy the kids something to

16  eat.

17  Q.    Those nights, she would still bring up drugs?

18  A.    Yes.

19  Q.    You would hang together?

20  A.    Yes.

21  Q.    Some nights you would sell drugs, some nights you

22  wouldn't.

23        How many nights in October and November,

24  those two months, was Linette at Faye's house?

25  A.    Majority of the time.

1    Q.    Well, what's majority?  51 percent or 90 percent?

2    A.    No.  90, around 90.

3    Q.    That's what Faye said?

4    A.    Yes.  A high percentage.

5    Q.    High percentage.

6          And when Linette was there, would she stay in

7    the house all night long?  Would she leave?  Would she

8    come and go?

9    A.    Well, they would both come and go.  She wouldn't

10   always stay there the entire night.  Sometimes she'll

11   come there for an hour.  She might have to go pick her

12   little son up.  Then she'll come back.  Then she might

13   run down there to the football field and gather all the

14   kids, come back, and then we'll just sit down and talk,

15   or I might go out back while they're inside.

16   Q.    All right.

17   A.    So it varied.

18   Q.    Now, Faye said in a 302 that you -- she observed

19   you cooking crack three or four times a week?

20   A.    Right.

21   Q.    Now, is that -- is that true or false or do you

22   have --

23   A.    I think she seen me cook crack two times in a week.

24   Q.    Okay.

25   A.    Because I never recall -- as a matter of fact, and

1    I know I'm from low income, but my memory is kind of

2    good.  And the thing about this is that I do recall I

3    never cooked twice -- no more than twice in one week.

4    Q.    And what was the most you ever cooked of powder

5    cocaine into crack cocaine in any particular session?

6    A.    An ounce.  An ounce.

7    Q.    An ounce is the most?

8    A.    Yes.  And I never cooked more than an ounce in one

9    week ever.

10   Q.    Okay.

11             So if you cooked an ounce, that would be the

12   only -- only quantity you would cook in a week?  How many

13   grams in an ounce?

14   A.    28.

15   Q.    And so you would put 28 grams -- could you cook that

16   at one session?

17   A.    Yes, because I had a larger mixing bowl.

18   Q.    You take 28 grams of powder.  You put 28 grams of --

19   A.    Sodium bicarbonate.

20   Q.    -- sodium bicarbonate.  Put it together, which is

21   56 grams.  You add water.

22             How much water do you put in?

23   A.    Just enough to saturate the mixture.

24   Q.    And then it cooks down?

25   A.    Yes.

1    Q.    Okay.

2          And how long does that take?

3    A.    It depends on how high you have the fire.  It

4    depends.

5    Q.    Okay.

6    A.    If I'm in a rush, I might just do it in about seven

7    minutes, ten minutes.  If I want it cooked, I can do it

8    in about 15.

9    Q.    Okay.

10          Now, Linette testified that she was there on

11    two occasions when you cooked up powder into crack

12    cocaine.

13    A.    Yes.

14    Q.    Do you agree that that is true?

15    A.    Yes, I do.

16    Q.    Okay.

17          Was there -- were there ever times when you

18    would cook crack cocaine, that it didn't sell that night,

19    or all of it sell that night?

20    A.    Many nights.

21    Q.    And what would you do with that?

22    A.    I would wrap it back up and take the drugs over to

23    Miss Crawford's home, or some nights, if it was the

24    weekend, I will leave it at Miss Bullock's home, because

25    that was our agreement:  For Miss Bullock to hold the

1    drugs on the weekends, because only reason why Miss

2    Bullock didn't hold the drugs more often was because she

3    was scared to hold it on the weekdays because she was

4    afraid that WHA, which is the governing body, which

5    governed the projects, would come into the house and

6    search and find drugs.

7    Q.    And then she'd be evicted?

8    A.    Yes.  She wasn't afraid on the weekends because

9    they don't work on the weekends.

10   Q.    In November, now, you're selling powder and you're

11   selling some crack cocaine?

12   A.    Yes.

13   Q.    Is that right?  Starting late October, November?

14   A.    Yes.

15   Q.    How often, from the time you started cooking crack

16   cocaine, up until you got arrested on December the 8th,

17   would you say you cooked crack in Faye's house?

18   A.    How many times?

19   Q.    How many times?

20   A.    Between five and ten.

21   Q.    Okay.

22             So a total of -- a maximum of ten times?

23   A.    Yes.

24   Q.    And what was the weight, average, or --

25   A.    Average weight?  I can tell you exactly.  I can

Chambers - direct                              160

1    give you an exact number if you give me a minute.

2    Q.    Go ahead.

3                (Pause.)

4                THE WITNESS:  Eight.  Eight.

5    BY MR. BENSON:

6    Q.    Eight what?

7    A.    I cooked eight times.

8    Q.    You cooked eight times?  And what was the weight

9    that you cooked?

10   A.    With the first two ladies, it was two eight-balls.

11   And then the week after that, it was a quarter.  And I

12   remember holding onto it for a little while, then there

13   was another quarter.

14   Q.    Now, quarter of what?

15   A.    That's a quarter-ounce, 7 grams.

16   Q.    Quarter-ounce, not a quarter-key?

17   A.    No, not a quarter-key.

18   Q.    Quarter-ounce?

19   A.    Yes.

20   Q.    Okay.

21   A.    I never cooked more than an ounce.

22   Q.    Never cooked more than an ounce?

23   A.    Yes.  So everything I'm saying, we're dealing with

24   ounces.  So we're talking about half-ounce, quarter to a

25   quarter-ounce.

1    Q.    So even if you cooked an ounce --

2    A.    It's only one ounce.

3    Q.    -- one ounce.  If you cooked it 16 times, that

4    would only be a pound; right?

5    A.    Sometimes --

6    Q.    Am I right or wrong?

7    A.    What?

8    Q.    If you cooked an ounce 16 times from October

9    through November, that would be a pound?

10   A.    That's correct.

11   Q.    And that would still be less than a key?

12   A.    Yes.

13   Q.    If you -- if you were to double -- double what you

14   say you cooked eight times, if you cooked it 16 times,

15   you never cooked more than an ounce, ever?

16   A.    In what particular setting?

17   Q.    Yes.

18   A.    No.

19   Q.    And an ounce of powder would cook down to less than

20   an ounce; is that right?

21   A.    Between 24 -- like the officer said, it really

22   depends on the period you have the cocaine.  So sometimes

23   it would be 21 when you get the garbage out, as he

24   explained, or you get the good stuff, where it comes back

25   to 27.  But the majority of time, from my experience, it

Chambers - direct                           162

1   always comes back to 24, in that area.

2   Q.    Now, again, you get powder cocaine.

3   A.    Yes.

4   Q.    And you get it somewhere, and then what do you do

5   with it when you get it?

6   A.    First thing I do is I break it down into quarter-keys.

7   Q.    So you get a key?

8   A.    Yes.

9   Q.    And then you break it down.

10             Now, where do you do that?

11  A.    I might do it anywhere.  I might do it in a vacant

12  house.

13  Q.    Okay.

14  A.    I might do it in my house.  I might do it upstairs

15  in Faye's back bedroom.  I might go over Nettie's house

16  and do it in Nettie's house.

17  Q.    You break it down into quarter-keys?

18  A.    Yes.

19  Q.    You wrap it in the tape?

20  A.    Yes.

21  Q.    And then you take it to Linette?

22  A.    Yes.

23  Q.    And she holds it?

24  A.    She will fit three in her little son -- her little

25  son have a yellow bag.  She put three in the yellow bag

1   and put one in my black bag.

2   Q.    All right.

3   A.    Along with my bags and my cutting agent, she'll

4   have all of that in one bag.

5   Q.    Okay.

6   A.    So whenever I want it, she'll bring the whole bag.

7   Q.    Okay.

8         And then she would bring the whole bag to

9   you?

10  A.    Yes.

11  Q.    Okay.

12        In November, there was a period of time when

13  you -- well, there was a time when you got shot?

14  A.    Yes.

15  Q.    Just, very briefly, explain to the Court the

16  circumstances surrounding that shooting.

17  A.    It was late night, and these guys -- I got caught

18  in the crossfire.

19  Q.    Were you involved in the shooting in any way?

20  A.    No.

21  Q.    Was it determined through investigation you were

22  an innocent victim?

23  A.    Yes.

24  Q.    Okay.

25  A.    But as I read -- I think I read a report to where

Chambers - direct                    164

1  somebody said that I was a victim of a drive-by shooting,

2  but -- a victim of an attempted robbery or a drug deal

3  gone bad, but that has never been proven.

4  Q.    Well, is it true?

5  A.    No.

6  Q.    So what happened?

7  A.    What happened was, as far as I know, the detective

8  never got back to me who was investigating.

9  Q.    No.  You were there somewhere and you got shot?

10 A.    Yes.

11 Q.    Tell the circumstances how you got shot.

12 A.    Two cars pulled up.  Gunfire erupted between the

13 two cars.

14 Q.    Between the two cars?

15 A.    Yes.  I was talking to Miss Bullock at the time and

16 I got shot.  I ran in Miss Bullock's home at first and

17 then I went, proceeded to Nicole, where Nicole took me to

18 the hospital.

19 Q.    For a period of a couple weeks?

20 A.    Yes.

21 Q.    As Faye said, you chilled out or whatever it was?

22 A.    Yes.  I just chilled, because I was really going to

23 give the game up anyway.  I wanted to leave the drug game

24 alone because Nicole had started her C.P.A. and I was

25 thinking about going back to grad school.  And I

Chambers - direct                           165

1    realized, you know, that money wasn't that enough.  I

2    said it's time to leave it alone.

3    Q.    What two weeks were these in November that you

4    stopped dealing drugs?

5    A.    These are the middle weeks.

6    Q.    Was it around Thanksgiving?

7    A.    Before Thanksgiving.

8    Q.    For two weeks?

9    A.    Yes.

10   Q.    And then at some point after the two weeks you

11   started back up?

12   A.    Yes.

13   Q.    The drugs?

14   A.    Those are -- the two weeks after that.

15   Q.    I didn't hear you?

16   A.    Yes.  You're right.

17   Q.    And tell us about the scale, the circumstances

18   surrounding the purchase of the scale.

19   A.    Okay.  Well, the big scale costs $65 at staples.

20   The other scale only cost a buck-25.

21   Q.    You mean only?

22   A.    The little scale.

23   Q.    Yes?

24   A.    So --

25   Q.    What do you mean, only?

Chambers - direct                                166

1   A.    It costs 125.

2   Q.    The little scale was more expensive than the big

3   scale?

4   A.    Yes.  The big drug dealer scale cost less than the

5   little drug dealer scale.

6   Q.    Why did you have a ten-pound scale?

7   A.    To make sure no one beat me when I went and

8   purchased a kilogram.

9   Q.    What does that mean?

10  A.    Beat me?

11  Q.    Yes.

12  A.    So nobody wouldn't short me on grams.

13  Q.    In other words, the accuracy of it?

14  A.    Yes.

15  Q.    And that scale cost you $65?

16  A.    Yes.

17  Q.    Now, when you were arrested on December the 8th,

18  in Faye's house there were 30 grams of crack cocaine.

19  A.    Well, as I read the --

20  Q.    Is that right or wrong?

21  A.    They said it was outside in the overhang.

22  Q.    Well, there were 30 grams found.

23  A.    Yes.

24  Q.    Now, where did they come from?

25  A.    They were outside.

Chambers - direct                          167

1    Q.    Well, they were yours, weren't they?

2    A.    Yes.  Well, as a matter of fact, that's the last

3    time I had cooked up --

4    Q.    And when was that?  When was the last time?

5    A.    I cooked up 7:00 o'clock that evening and I got

6    done around 8:30.  And I had some left over, but because

7    I had finals due that week, and the girls were asking

8    for some money Friday so they took the kids shopping.  I

9    said I'm going to cook up, even though I got a couple

10   bags left over, I'm going to cook up and make sure these

11   girls get their --

12   Q.    So you cooked up an ounce?

13   A.    Yes.

14   Q.    That ended up being like 24 grams or thereabouts?

15   A.    That was 24 grams.  Exactly.

16   Q.    And then you had like 6 or 7 grams left over?

17   A.    Yes.

18   Q.    And the combination is the 30 grams?

19   A.    Yes.  The combination of the two.

20   Q.    Is that typical of the quantity of crack cocaine

21   that you would have at Faye's house at any particular

22   time?

23   A.    Yes.

24            THE COURT:  Let me stop for a minute and

25   talk about schedule.

1          How much longer do you think you'll be?

2          MR. BENSON:  Not much longer, Judge, to be

3    honest with you.  I'm sort of winding down.  I don't

4    know about cross, of course.

5          THE COURT:  I take it you'll be a while on

6    cross?

7          MR. PRETTYMAN:  I think so, your Honor.

8          THE COURT:  All right.  Since I've got this

9    matter scheduled at 2:00, I've got people from out of

10   town.  I think what I'm going to do is reschedule the

11   balance of this to tomorrow.

12         MR. BENSON:  Judge, my only problem with

13   that is I've got multiple Superior Court appearances in

14   the morning.  I know this certainly would take priority.

15   I just don't know how I can get them rescheduled.

16         THE COURT:  We can reschedule this to the

17   afternoon, if you want to do that?

18         MR. BENSON:  What I guess I need to do is call

19   my office at some point and contact your Honor about that.

20   I'm just not sure what my schedule is.

21         THE COURT:  That's fine.

22         All right.  We can plan on restarting tomorrow

23   at 1:00 or 1:30, if you want to do that?

24         MR. BENSON:  If I may ask your Honor --

25         THE COURT:  Why don't we just do this.  For

1    me, it's easier to start in the morning.  And so why don't

2    we assume we'll start at 1:30.  But you can just go take a

3    break now, call your secretary.  The two of you can come

4    back in and give me a time.  If the time is 10:00 o'clock,

5    that's fine with me, and if it's 1:30, that's fine with

6    me.

7              MR. BENSON:  I guess my question, if I may,

8    are you available pretty much that day, because I have a

9    couple case reviews and things like that.  I might be

10   able to start at 11:00 or 11:30?

11             THE COURT:  That's fine.

12             MR. BENSON:  So it can be any time?

13             THE COURT:  Well, any time from 10:00 o'clock

14   on.

15             MR. BENSON:  That's what I've meant.

16             THE COURT:  I've got to leave at about 3:15.

17             MR. BENSON:  Okay.  So that's fine.  I just

18   wanted to make sure.

19             THE COURT:  So any time in that block, if you

20   want to do that, that's fine with me.

21             MR. BENSON:  I will call right outside.

22             THE COURT:  And so we'll go into recess, and

23   in a few minutes or later this afternoon, you'll come back

24   in and tell me.  I think what we really need to do is tell

25   the Marshals when to have Mr. Chambers here.

1          So why don't you come back in, if you can,

2    in a couple minutes and let me know what you've found out?

3          MR. PRETTYMAN:  Thank you.

4          MR. BENSON:  That's fine, Judge.

5          THE COURT:  Okay.  So we'll recess now and

6    we'll call the lawyers in for that civil case who are here.

7          All right.  You may step down.

8                    (Witness excused)

9                    - - -

10         MR. PRETTYMAN:  Your Honor, because of the

11   evidence, with respect to the drugs and other things, may

12   that stay in the custody of Detective Sullivan for the

13   purposes of this hearing?

14         MR. BENSON:  I don't have a problem.

15         THE COURT:  All right.  That's fine.

16         MR. BENSON:  Also, I may be going over to

17   Gander Hill.  I presume it would be all right to talk to

18   my client?

19         THE COURT:  Yes.  My rule is if he's on cross,

20   then there's a problem.  But he's not on cross.

21         MR. BENSON:  Okay.  I wasn't sure how that

22   worked.  Thank you, Judge.

23         THE COURT:  I'm assuming people are going to

24   want to have written comments to me about what the record

25   shows.  What do you expect to do in terms of the final

1    presentation?

2              MR. BENSON:  I wouldn't think it would be

3    necessary, your Honor, to have written comments.  We're

4    going to finish up tomorrow.

5              THE COURT:  If you want to plan on making

6    some summary statements tomorrow after the evidence is

7    in, that's fine with me.  I'm not sure I'm comfortable

8    reaching any conclusions from the bench, but I may.

9    We'll talk tomorrow at the end about what you want to do

10   and if on sleeping on it you think you want to do a

11   written summary after we get the transcript, that's fine

12   with me.  If you would rather go ahead and make comments

13   tomorrow, that's also fine with me.  I'm not sure I'm

14   going to make a decision right away.

15             MR. BENSON:  Yes.  That's fine.  I have no

16   problem with that.  Thank you, Judge.

17             MR. PRETTYMAN:  Thank you.

18             THE COURT:  See people tomorrow and I will

19   see you in a couple minutes.  You come into the courtroom

20   and I will interrupt things.  Give me a time for tomorrow.

21             MR. BENSON:  Okay.

22             (Court recessed at 2:08 p.m.)

23                          - - -

24

25

1

2                          I N D E X

3   PLAINTIFF'S TESTIMONY

4       CONTINUED                    DIRECT  CROSS  REDR  RECR

5

6   Detective Liam Sullivan ---------    3     44    110   ---

7

8   DEFENDANT'S TESTIMONY

9       CONTINUED

10

11  Darryl Chambers (the defendant) -   122    ---    ---   ---

12

13                          - - -

14

15

16

17       I hereby certify that the foregoing is a
         and accurate transcript from my stenographic
18       notes in the proceeding.

         *Valerie J. Gunning*

19                     Official Court Reporter
                       U. S. District Court

20

21

22

23

24

25